UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Judson W. Holmes, *et al.*,

                    Plaintiffs,                    **MEMORANDUM & ORDER**
                                                   08-CV-5232 (KAM)(CLP)

          v.

Air Line Pilots Association,
International, *et al.*,

                    Defendants.
----------------------------------------X

**MATSUMOTO**, United States District Judge:

          Plaintiffs, twenty-one former Delta Air Line, Inc.

pilots, who were required by previous federal law to retire at

age 60 during the period between September 16, 2006 and December

4, 2007, commenced this action against Delta Air Lines, Inc.

("Delta"), the Air Line Pilots Association, International

("ALPA" or "the Union"), and the president of ALPA, John Prater

("Prater"),[1] alleging, *inter alia*, (1) violations of the Age

Discrimination in Employment Act ("ADEA") and the Older Workers

Benefit Protection Act ("OWBPA"),[2] 29 U.S.C. §§ 621 *et seq.*,

against both defendants, (2) breach of contract against ALPA,

---

[1] Plaintiffs sue Prater in his representational capacity only. (Am. Compl. ¶¶ 3(c), 65, 67.) As such, all references to ALPA include Prater.

[2] In 1990, Congress enacted the OWBPA as an amendment to the ADEA. *See McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 239 (S.D.N.Y. 2006). Although plaintiffs generally cite to the OWBPA, they do not appear to allege facts or specifically pursue a separate cause of action under the provision. To the extent that plaintiffs intend to pursue claims pursuant to the OWBPA, the court's analysis is intended to apply to those claims.

1

and (3) breach of implied contract against Delta.[3] (*See*
*generally* Doc. No. 1, Compl.; Doc. No. 3, First Amended
Complaint ("Am. Compl.").) Delta and ALPA separately move to
dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1)
and 12(b)(6), and the court held oral argument on both
defendants' motions on April 21, 2010. (Doc. No. 40, ALPA's
Motion to Dismiss ("ALPA Mot."); Doc. No. 43, Delta's Motion to
Dismiss ("Delta Mot."); Tr. of 4/21/10 Oral Argument ("Tr.").)
For the reasons that follow, the motions of ALPA and Delta are
both granted, and plaintiffs' claims are dismissed in their
entirety.

## BACKGROUND

The following facts are taken from plaintiffs' Amended
Complaint, which the court must assume to be true for the
purposes of resolving Delta's and ALPA's motions to dismiss and,
where indicated, the factual background is supplemented by facts
and information drawn from documents external to the Amended
Complaint, which plaintiffs explicitly reference, rely upon or
cite to within the Amended Complaint, or are in the purview of

---

[3] Plaintiffs originally brought ten claims against Delta and ALPA. In a
stipulation dated April 27, 2010, plaintiffs withdrew without prejudice their
declaratory judgment claim against ALPA, Railway Labor Act claims against
both defendants, constructive trust claim against ALPA, conversion claim
against ALPA, and ADEA claims based upon a theory disparate impact against
both defendants. (*See* Doc. No. 50, Stipulation of Withdrawal of Claims
("Stip.") ¶¶ 1-6.) The Stipulation of Withdrawal was so ordered by this
court on April 29, 2010. (Doc. No. 52.)

judicial notice.  These external documents have been provided to the court as attachments to the defendants' motions to dismiss.

I. **Parties**

Plaintiffs are twenty-one former Delta commercial airline pilots, hired at various dates ranging "almost exclusively between 1972 and 1991."  (Am. Compl. ¶ 55.)  All plaintiffs, with the exception of one,[4] were born between September 16, 1946 and December 4, 1947, and turned sixty between September 16, 2006 and December 4, 2007.  (*See id.* ¶¶ 12-53.)  Plaintiffs were required to retire on their sixtieth birthdays pursuant to the Federal Aviation Administration's ("FAA") longstanding "Age 60 Rule."[5]  (*Id.* ¶¶ 86-87, 96.)  On December 13, 2007, President Bush signed into law the Fair Treatment of Experienced Pilots Act ("FTEPA"), 49 U.S.C. § 44729, an act permitting commercial airline pilots to continue working as such until the age of sixty-five.  (*Id.* ¶ 88.)  However, FTEPA was not retroactive and did not allow pilots, who were under the age of sixty-five but who had already retired under the Age 60 Rule, to return to their former jobs, or to maintain their seniority and position if the pilot returned to

---

[4] Plaintiff Billy Hall was born on December 30, 1947.  (Am. Compl. ¶ 31.)

[5] The "Age 60 Rule," 14 C.F.R. § 121.383(c), is a regulation originally adopted by the FAA in 1959, which required all "pilots of major United States commercial airlines . . . to retire upon attaining their sixtieth birthdays." (Am. Compl. ¶ 86.)

commercial flying. (*Id.* ¶ 89.) Thus, because plaintiffs, with the exception of one, turned sixty before the enactment of FTEPA on December 13, 2007, they had already retired and could not return to their former jobs, as prescribed by FTEPA.[6] (*Id.*)

Defendant ALPA is a labor union for airline pilots and acts as the exclusive bargaining representative of Delta's pilots, including plaintiffs, during the time of their employment with Delta. (*Id.* ¶¶ 60, 73.) ALPA acts through a Master Executive Council ("MEC") at each airline at which it represents pilots. (*Id.* ¶ 68.) The MEC at each airline, comprised of pilots from that airline carrier, serves as the coordinating council for Union membership at that airline. (*Id.* ¶¶ 69-70.) Defendant Prater is the President of ALPA and is sued only in his representational capacity. (*Id.* ¶¶ 3(c), 65, 67.) Defendant Delta, an airline carrier, employed all of the plaintiffs prior to their mandatory retirement under the Age 60 Rule. (*Id.* ¶¶ 55, 56, 58, 84, 87.)

## II. <u>Delta's Bankruptcy & Bankruptcy Restructuring Agreement (Letter of Agreement # 51)</u>

In October 2004, Delta negotiated concessions from its pilots and subsequently reduced its pilots' salaries by approximately one third of their prior pay. (*Id.* ¶ 99.) On

---

[6] There was no legal obstacle prohibiting retired pilots under the age of 65 from returning to commercial flying; however, these pilots would be on equal footing with all other new pilot hires. (Am. Compl. ¶ 90.)

September 14, 2005, Delta filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York ("the Bankruptcy Court"). (*Id.* ¶ 102.) Notice of Delta's bankruptcy was sent to all Delta employees in a notice process that was completed on September 30, 2005. (*See* Doc. No. 43, Ex. 1, Delta's Notice of Bankruptcy & Ex. 2, Aff. of Mailing.) On June 22, 2006, a second notice of bankruptcy was sent to all Delta employees, advising them about the process of filing claims against Delta and filing requests for payment from Delta. (Doc. No. 43, Ex. 3, Delta's Second Notice of Bankruptcy & Ex. 4, Aff. of Mailing.) Finally, on May 10, 2007, potential claimants, including Delta's employees, were notified of the cutoff date for asserting claims against Delta that arose after the petition date of September 14, 2005 but prior to April 30, 2007, the "Effective Date" of Delta's Bankruptcy plan. (*See* Doc. No. 43, Ex. 5, Affs. of Publication.)

During the Chapter 11 reorganization, ALPA and Delta entered into a Bankruptcy Restructuring Agreement, memorialized as Letter of Agreement # 51 ("Letter 51"), which modified the existing 2004 Pilot Working Agreement ("PWA") between Delta and ALPA and granted further concessions to Delta.[7] (Am. Compl.

_____

[7] In 2004 and 2005, ALPA and Delta had entered into previous letters of agreement, which modified the PWA and granted significant concessions to Delta. (Am. Compl. ¶¶ 125-127.)

¶¶ 125, 128.)  The PWA is a collective bargaining agreement ("CBA") between Delta and ALPA which sets forth the rates of pay, rules, working conditions, and benefits fund contributions for Delta's pilots.  (Am. Compl. ¶¶ 74, 125, 132; Doc. No. 43, Ex. 6, Letter of Agreement 51 ("Letter 51") at 1.)  Section 19 of the PWA provides that the Delta Pilots' System Board of Adjustment, established in compliance with Section 204, Title II of the Railway Labor Act (the "RLA"), as amended, 45 U.S.C. § 151 *et. seq.*, "will have jurisdiction over disputes growing out of grievances or out of the interpretation or application of any of the terms of the PWA."  (Doc. No. 41, Ex. 4, Pilot Working Agreement ("PWA") at 175.)  Letter 51 provides that "[t]his BANKRUPTCY RESTRUCTURING AGREEMENT is made and entered into in accordance with the provisions of the Railway Labor Act, as amended" and it specifies amendments, additions, and deletions to the PWA section by section.  (Letter 51 at 1-2.) ALPA and Delta agreed that Letter 51 would remain in effect for forty-three months, beginning on June 1, 2006 and ending on December 31, 2009 (the "concessionary period" or "term of Letter 51").  (Am. Compl. ¶ 130; Letter 51 at 2.)

Among the concessions contained in Letter 51 was an additional 14% decrease in the Delta pilots' hourly pay rates. (Letter 51 at 5; *see also* Am. Compl. ¶ 132.)  In consideration for these salary reductions and other concessions, Delta gave

ALPA a non-priority, unsecured $2.1 billion bankruptcy claim

("the ALPA Claim"). (Am. Compl. ¶¶ 131-32; Letter 51 at 36-37.)

Letter 51 specifically provided that the ALPA Claim was given to

ALPA "in respect of the concessions made by ALPA and savings to

[Delta] resulting from achievement of consensual [m]odifications

to the PWA." (Am. Compl. ¶ 136 (quoting Letter 51 at 36).)

Letter 51 also contained a provision that provided, in

relevant part, that ALPA "would essentially support any

voluntary, involuntary or distress termination of the Delta

Pilots Retirement Plan and other related retirement plans."

(Am. Compl. ¶ 134; Letter 51 at 37.) In exchange, Delta agreed

to provide ALPA with convertible notes in the amount of $650

million (the "Notes") in the event that the Delta Pilots

Retirement Plan ("DPRP") was terminated. (Am. Compl ¶ 133;

Letter 51 at 17-18, 37, 40-42.) Delta also sought, and

received, approval of the termination of the DPRP by the Pension

Benefit Guaranty Corporation ("PBGC")[8] in exchange for an

unsecured $2.2 billion bankruptcy claim and $225 million in

cash.[9] (Am. Compl. ¶¶ 118, 120, 121; Notes Dispatch at 6.) With

_____

[8] The PBGC is a federal corporation created by the Employee Retirement Income
Security Act of 1974 to protect the pensions of American workers and retirees
in private sector defined benefit pension plans. (Am. Compl. ¶ 118.) The
PBGC guarantees certain benefits under ERISA pension plans and may terminate
underfunded pension plans. *See* 29 U.S.C. § 1342.

[9] By law, the PBGC "treats a portion of the [$2.2 billion unsecured bankruptcy
claim and $225 million cash] recovery as a part of the [DPRP] assets as of
the termination date, in respect of unpaid contributions, and shares the

permission from the Bankruptcy Court, Delta terminated the DPRP on September 2, 2006.  (Am. Compl. ¶¶ 115, 118, 121.)

The Bankruptcy Court approved of Delta and ALPA entering into modifications of the collective bargaining agreement set forth in Letter 51.  (*See* Doc. No. 43, Ex. 7, Bankruptcy Court's Approval Order ("Approval Order").)  Delta later assumed Letter 51 in its Bankruptcy Restructuring Plan, which was subsequently approved and memorialized by Order of the Bankruptcy Court.  (Am. Compl. ¶ 129; *See* Doc. No. 43, Ex. 11, Delta's Bankruptcy Reorganization Plan (the "Plan") & Doc. No. 10, Bankruptcy Court's Confirmation Order (the "Confirmation Order").)

## III. <u>Allocation Models for the ALPA Claim & Notes</u>

According to the Amended Complaint, Letter 51 provided ALPA, through its MEC, "exclusive authority" to determine the manner of allocating the ALPA Claim and the Notes (jointly "the proceeds") for distribution among Delta pilots.  (Am. Compl. ¶ 137; Letter 51 at 36-37, 40.)  The only agreed-upon restriction contained in Letter 51 on ALPA's authority to determine the allocation method for the ALPA Claim was that the

remainder with [DPRP] participants in a pro rata manner with respect to loss to the PBGC (for unfunded PC-4 benefits) and the loss to [DPRP] participants (for all other unfunded benefits)."  (Doc. No. 43, Ex. 9, 2007 ADC Notes Dispatch ("Notes Dispatch") at 6.)

method be "reasonable and lawful."[10]  (Am. Compl. ¶ 138; Letter 51 at 36.)  Letter 51 further required that the distribution of the Notes "comply with law or regulation" and "be capable of being calculated and tracked by computer."  (Letter 51 at 40.)

On or about August 4, 2006, the MEC selected three pilots to serve as members of the Allocation and Distribution Committee ("ADC").[11]  (Am. Compl. ¶ 140.)  The MEC directed the ADC to analyze the issues surrounding the ALPA Claim and the Notes, to make recommendations concerning fair methods of allocating the proceeds, and to oversee the distribution of the proceeds based on such allocation models.  (*Id.* ¶ 141.)  The ADC developed two models, described below, to allocate the ALPA Claim and the Notes, which were unanimously adopted by the MEC. (Doc. No. 43, Ex. 8, 2006 ADC Claim Dispatch ("Claim Dispatch") at 1, 8; Notes Dispatch at 1.)).

A. The Claim Allocation Model ("Claim Model")

The ADC Claim Dispatch of October 9, 2006 explained

---

[10] Although plaintiffs appear to allege that allocation methods developed for both the ALPA Claim and the Notes were subject to Letter 51's "reasonable and lawful" provision, the court notes that Letter 51 clearly provides that the "reasonable and lawful" provision applied to the ALPA Claim, and does not provide for application to the Notes.  (*Compare* Letter 51 at 36 *with* Letter 51 at 40.)

[11] The Amended Complaint does not identify the three pilots serving on the ADC, or make any specific allegations regarding these pilots.  Instead, plaintiffs generally allege that the appointment of the ADC "was a mere smokescreen designed to lend apparent credibility and ethical suasion to a scheme to deprive the oldest pilots [of their proceeds]."  (Am. Compl. ¶ 142.)

that, when developing the Claim Model, the ADC focused on an allocation method that "would recognize the varying types and degrees of concessions and fairly allocate the claim to those pilots who work (or may work) under the terms of Letter 51." (Am. Compl. ¶ 143 (quoting Claim Dispatch at 1); *see also* Claim Dispatch at 6 ("Considerable time was spent during the development phase discussing how the allocation model should appropriately treat those who were not active pilots while ensuring that those who work during the term of Letter 51 received a fair allocation.").) The ADC Claim Dispatch indicated that the primary goal of developing the Claim Model was "to arrive at a fair allocation solution while avoiding unnecessary complexity." (Am. Compl. ¶ 146 (quoting Claim Dispatch at 2).)

According to the Amended Complaint, the Claim Model divided the face value of the ALPA Claim into four "silos" of equal proportion, each representing a quarter of the $2.1 billion ALPA Claim. (*Id.* ¶¶ 147, 150.) Under the Claim Model, the sum of those four silos amounted to the total claim allocation for each given pilot. (*Id.* ¶¶ 148, 153.) The four silos were the following: (1) *per capita*;[12] (2) system

---

[12] The *per capita* silo "recognizes the across the board concessions of the Delta pilots." (Claim Dispatch at 2.) Thus, for the *per capita* silo, every eligible Delta pilot would receive an equal allocation. (Am. Compl. ¶ 150(a).) The *per capita* silo was "fixed as of June 1, 2006, and every

seniority;[13] (3) years-of-service;[14] and (4) hourly rate.[15]  (*Id.* ¶ 150.)  Only pilots, such as plaintiffs, who were on the Delta pilots' System Seniority List on June 1, 2006, the effective date of Letter 51, were eligible to participate in the allocation.  (*Id.* ¶ 151; Claim Dispatch at 2.)

Under the Claim Model, pilots who would not work for the full 43-month term of Letter 51 (from June 1, 2006 through December 31, 2009) would have the amount of their silo allocation decreased or "forfeited," as explained below.  (*See* Am. Compl. ¶ 156; Claim Dispatch 6-8.)  Among the pilots subject to decreased allocations as a result of not working during the entire 43-month period of Letter 51 were pilots, including plaintiffs, who would be required to retire under the Age 60 Rule during the concessionary period, "special case pilots" on

_____

eligible Delta pilot receive[d] an equal allocation" in the *per capita* silo. (Claim Dispatch at 2.)

[13] Under the system seniority silo, the most senior pilot would receive twice the claim allocation of the most junior pilot, calculated using monthly data from June through October 2006 and then fixed for the duration of Letter 51. (Am. Compl. ¶ 150(b); Claim Dispatch at 2-3.)

[14] The years-of-service silo was calculated "in recognition of length-of-service related concessions." (Am. Compl. ¶ 150(c) (quoting Claim Dispatch at 3).)  It measured a pilot's actual length of service for Delta and was calculated based on a pilot's employment longevity, including years, months and days of service. (Am. Compl. ¶ 150(c); Claim Dispatch at 3.)  "While similar to the seniority silo, the years-of-service silo takes into account the fact that while some pilots may hold similar seniority numbers, their years of service may differ significantly." (Claim Dispatch at 3.)

[15] For the hourly rate silo, a pilot's hourly rate during the period of June through October 2006 was to be used as the base, and would be increased by projected rates for the duration of Letter 51. (Am. Compl. ¶ 150(d); Claim Dispatch at 3.)

personal leave, furlough,[16] bypass,[17] and long-term disability, as well as pilots who would end their employment relationship with Delta voluntarily, either by resigning or retiring before the age of 60. (Am. Compl. ¶¶ 158-63; Claim Dispatch at 6-8.) The Claim Model provided that the proceeds forfeited from the allocations of any pilot who would not work the full term of Letter 51 would subsequently be distributed to those pilots who did work during the full duration of Letter 51. (Am. Compl. ¶ 157; Claim Dispatch at 8 ("Forfeiture and Redistribution Rule. All forfeited stock or claim sale proceeds will be distributed to all pilots whose allocations were not subject to forfeiture . . .").)

In formulating the allocation, distribution and forfeiture provisions, the Claim Model relied upon three dates: (1) the allocation date, which was estimated to occur "about November 1, 2006;" (2) the distribution date, which would be the date on which Delta exited bankruptcy;[18] and (3) the "amendable date," which was December 31, 2009, the last day of Letter 51. (Claim Dispatch at 6-8.)

Using these dates, the Claim Model developed different

---

[16] A furlough is a temporary leave of absence from employment.

[17] Pilots on bypass were pilots who had declined an opportunity to return from furlough.

[18] At the time the Claim Model was developed, the distribution date was unknown. (*See generally* Claim Dispatch.)

forfeiture formulas for each of these pilot sub-groups.  For
example, pilots who could potentially return to active status
with Delta, for example, those on personal leave, furlough,
bypass, and long-term disability, would not receive any
allocation from the hourly rate silo for the entire 43-month
period, even if they returned to active status during this time,
and their overall treatment under the Claim Model depended on
whether they had returned to active status before the
distribution date of the ALPA Claim.  (*Id.* at 6-8.)  If these
pilots failed to return to active status by the distribution
date, the pilots would "forfeit" their allocations in one to
three of the remaining three silos over the entire 43-month
period.  (*Id.*)

In contrast, the Claim Model provided that pilots who
voluntarily ended their employment relationship with Delta,
either by resignation or early retirement (i.e. not because of
the mandatory Age 60 Rule) would forfeit their entire
allocation, regardless of time worked during the 43-month
period, provided they stopped working at any time before the
distribution date.[19]  (*Id.* at 8.)

---

[19] As the distribution date was unknown at the time the ADC developed and the
MEC adopted the Claim Model, the amendable date could have occurred before or
after the distribution date.  (*See* Claim Dispatch at 7.)  In fact, Delta
emerged from bankruptcy on April 30, 2007, over two and a half years before
the amendable date of Letter 51 (December 31, 2009).  The timing of Delta's
emergence from bankruptcy theoretically created the possibility, under the

Finally, the Claim Model provided that pilots, like plaintiffs, who would reach the mandatory retirement age "in effect on the distribution date" (which, at the time was age 60) during the concessionary period would draw allocations from all four silos for the entire period in which they worked, but would "forfeit" the ALPA Claim proceeds for the period after which federal law mandated their retirement from employment as commercial pilots.[20]  (Am. Compl. ¶¶ 158-60; *see also* Claim Dispatch at 8 ("Pilots who will reach the mandatory retirement age in effect on the distribution date during the period before the amendable date of Letter of Agreement 51 (December 31, 2009)

---

terms of the Claim Model, that a pilot who did not face mandatory retirement during the concessionary period could work up until the distribution date, but leave before the end of the concessionary period without having his or her allocation subject to forfeiture for the period in which he or she did not work.  Although plaintiffs do not allege that this situation actually occurred, they appear to argue that ALPA's failure to account for such a possibility demonstrates that it targeted the "oldest" workers for forfeiture on the basis of age.  (Am. Compl. ¶¶ 161-62, 164.)  Notably, as will be discussed, *infra*, plaintiffs allege that FTEPA's enactment (December 13, 2007) occurred 7 months after the distribution date (April 30, 2007); yet the MEC waived application of the forfeiture provision to those pilots who had already received decreased allocations due to their projected retirement during the concessionary period because these pilots were then able to continue to work during the concessionary period, albeit with reduced pay and other concessions as provided by Letter 51.  (Am. Compl. ¶ 88, 167.)

[20] Although plaintiffs do not allege that they were similarly-situated to the other pilots subject to forfeiture, they contend that the forfeiture provision that applied to them was discriminatory, unlawful, and unreasonable.  (*See generally* Am. Compl; Tr. at 100-102 (conceding at oral argument that plaintiffs were not similarly-situated to the other pilots subject to forfeiture).)  Specifically, plaintiffs allege that that ALPA "did not seek to explain to its pilots why those pilots who would be forced to retire within the 26 months following ALPA's adoption of its methodology concerning the claim allocation would not, at the very least, share in the *per capita* and years of experience 'silos.'"  (Am. Compl. ¶ 165.)  As noted, plaintiffs further allege that the Claim Model did not require forfeiture from "those pilots who might leave [Delta's] employ immediately after receiving their full claim distribution."  (*Id.* ¶ 161.)

14

will forfeit the amount of their allocation calculated for the period beyond the mandatory retirement age.").)

Notably, the Amended Complaint indicates that, despite this "forfeiture" provision provided for by the Claim Model, when Congress enacted FTEPA on December 13, 2007, increasing the mandatory retirement age for commercial airline pilots from age sixty to age sixty-five, the MEC waived application of the forfeiture provision to pilots who had not yet attained the age of 60. (*See* Am. Compl. ¶¶ 88, 167.) Accordingly, of the 170 Delta pilots who would turn age sixty during the concessionary period of Letter 51, the 140 active pilots who attained age sixty after FTEPA's enactment and continued to work received their full allocation. (*Id.* ¶ 167.) Thus, only 30 pilots who reached the age of 60 during the term of Letter 51 but before FTEPA's enactment were affected by this forfeiture provision.[21] (*Id.*)

---

[21] The plaintiffs in this action are 20 of those 30 pilots who turned 60 before the mandatory retirement age was increased to age 65. Thus, they were unable to continue to work during the concessionary period and consequently did not have their forfeiture waived. (*See* Tr. at 8.) As noted, *supra*, an additional plaintiff to this action turned 60 after FTEPA's enactment. (Am. Compl. ¶ 31.)

B. <u>The Notes Allocation Model ("Notes Model")</u>[22]

In August 2007, the ADC presented the MEC with a proposed method to allocate the $650 million Notes that were provided to Delta's pilots in relation to the termination of the DPRP. (Notes Dispatch at 1.) The MEC accepted and adopted the ADC's proposed model to allocate the Notes among those pilots on the Delta pilots' System Seniority List on June 1, 2006. (*Id.*) After the approval of the Notes Model, ALPA informed the Delta pilots of the Notes Model by the ADC Notes Dispatch dated August 9, 2007. (*See id.*) According to the ADC Notes Dispatch, the Notes Model "addresses retirement-related issues and other items; it is not a mirror of or a replacement for the terminated Delta Pilots Retirement Plan (DPRP) or associated plans." (*Id.*) Further, the ADC Notes Dispatch clarified that "the [Notes] Model is designed for the Delta pilots as a group to address the retirement-related concessions and other issues of [Letter 51] and to, among other things, facilitate a transition from a 'defined benefit' based retirement system to a 'defined contribution' based retirement system. (*Id.* at 3.) Each pilot was able to view his or her Notes allocation as of August 28,

---

[22] Although plaintiffs allege that the Notes Model was discriminatory, the Amended Complaint does not explain the allocation method of the Notes and contains only sparse and conclusory allegations describing the discriminatory nature of the Notes Model. (*See* Am. Compl. ¶¶ 142, 168-71.) Accordingly, the court has had to rely upon the ADC Notes Dispatch to understand the Notes Model, and has attempted to piece together plaintiffs' allegations regarding it.

2007.  (*See* Delta's Mot. at 9.)

The Notes Model included two alternative methods for allocation.  (*See* Notes Dispatch at 3-4, 7.)  First, the Net Lost Approximate Qualified Benefit Allocation ("Benefits Lost Allocation") addressed the losses suffered by pilots as a result of the termination of the DPRP.  (*Id.* at 1-4, 7.)  Specifically, the Benefits Lost Allocation method considered a pilot's qualified benefit component and non-qualified benefit component.  (*Id.* at 1-7.)  The qualified benefit component, modeled upon the pilot's "net loss associated with the termination of the Delta Pilots Retirement Plan," was an approximated compensation amount which took into consideration a pilot's years of service and his or her final average earnings up to the Internal Revenue Service limit of $205,000 through December 31, 2004, offset by the projected amount the pilot would receive in benefits from the PBGC[23] and from a Money Purchase Pension Plan.  (*Id.* at 1, 3-6.)  For all pilots who were "projected to have at least 25 years

_____

[23] At the time the Notes Model was developed, the value that the PBGC would place on its $2.2 billion unsecured claim was unknown.  Given the need to develop a formula to distribute the Notes, the ADC set an estimated "*Model-defined* recovery ratio" for all pilots of 45 cents on the dollar for the PBGC's unsecured claim.  (*See* Notes Dispatch at 6 ("Over the past several months, the ADC has attempted to determine the valuation the PBGC will place on its $2.2 billion unsecured claim.  While the PBGC has provided us with its valuation policy, there is broad discretion in that policy regarding both the methodology and timing of that valuation . . . [T]o avoid an unacceptably lengthy period of time for allocation and distribution of the ALPA Notes, the Notes Allocation Model employs a *Model-defined* recovery ratio of 0.45 for the PBGC's unsecured claim, or 45 cents on the dollar, to determine the [Benefits Lost Allocation].") (emphasis in original).)

with Delta as of their 60th birthday," the calculation used the maximum final average earnings amount of $205,000. (*Id.* at 5.) The non-qualified benefit component provided all pilots participating in Delta's non-qualified benefit plans[24] with a 60% recovery ratio for losses associated with termination of those plans. (*Id.* at 1-2, 4, 7.) This recovery ratio accounted for the "contractual, uninsured nature and higher risk associated with non-qualified benefits." (*Id.* at 7.)

Second, the Years of Service Minimum Credit Calculation ("Minimum Credit Allocation"), based primarily on the pilot's years of service, was to be made "only *after* every pilot has his lost qualified benefit and lost non-qualified benefit (if any) addressed" and was designed as a "parallel allocation" to ensure a minimum allocation for all pilots. (*Id.* at 7-8.) Therefore, under the Notes Model, a pilot received the greater of the Minimum Credit Allocation amount or Benefits Lost Allocation amount, but not both. (*Id.* at 8.) Unlike the Claim Model, the Notes Model did not contain a "forfeiture" provision requiring decreased allocation because of early mandatory retirement under the Age 60 Rule. (*See generally id.*)

_____

[24] Non-qualified benefit plans are those that are uninsured or unfunded. (Notes Dispatch at 4.)

## IV. 2007 Bankruptcy Plan & Order: Exculpation Clause and Discharge & Release Clause

On April 25, 2007, the Bankruptcy Court issued an Order (the "Confirmation Order") confirming Delta's Joint Plan of Reorganization (the "Plan"). (Am. Compl. ¶ 105; *see generally* Confirmation Order.) The Confirmation Order and Plan provide for the discharge and release (the "Discharge and Release") of all "Claims"[25] against Delta:

> [T]he rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims, and shall terminate all Interests . . . against or in [Delta] or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code . . .[U]pon the Effective Date,[26] all existing Claims against [Delta] and Interest in [Delta] shall be, and shall be deemed to be, discharged and terminated.

(Confirmation Order ¶ 78; Plan § 13.3.) The Confirmation Order and Plan further provide for the Discharge of Delta, whereby each holder "of a Claim . . . is deemed to have forever waived, released and discharged [Delta], to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date [April 30, 2007]." (Confirmation Order ¶ 79;

---

[25] "Claims" are defined in the Plan as having the meaning set forth in Section 101(5) of the Bankruptcy Code, which defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A)(2006); (Doc. No. 43, Ex. 11, Delta's Bankruptcy Reorganization Plan ("Plan") § 1.1(33).)

[26] Delta's Joint Plan of Reorganization became effective on April 30, 2007 (the "Effective Date") and Delta exited bankruptcy.

Plan § 13.3.)

        The Confirmation Order and Plan also contain an

exculpation clause ("Exculpation Clause"), applicable to Delta

and ALPA, which states:

> [A]s of the Effective Date [April 30, 2007], none of
> [Delta] or the ALPA Released Parties[27] . . . shall have
> or incur any liability to any holder of a Claim or
> Interest for any act or omission in connection with,
> related to or arising out of, the Chapter 11 Cases,
> the negotiation of any settlement or agreement in the
> Chapter 11 Cases, the pursuit of confirmation of the
> Plan, the consummation of the Plan, the preparation
> and distribution of the Disclosure Statement, the
> offer, issuance and distribution of any securities
> issued or to be issued pursuant to the Plan . . . or
> the administration of the Plan or the property to be
> distributed under the Plan, except for willful
> misconduct, ultra vires acts or gross negligence.

(Confirmation Order ¶ 83; Plan §§ 1.1(9), 1.1(73), 13.5.)

        Finally, the Confirmation Order and Plan reinforce the

Discharge and Release and the Exculpation Clause with a broad

injunction ("Plan Injunction") against the assertion of

discharged claims against Delta (Confirmation Order ¶¶ 78-80;

Plan § 13.3), permanently enjoining "all persons or entities who

have held, hold, or may hold Claims or Interests," from and

after the Effective Date, from, *inter alia*, "commencing or

continuing in any manner any action or other proceeding of any

kind with respect to any such Claim . . against [Delta] . . . or

---

[27] The "ALPA Released Parties" include ALPA and the ALPA Delta Master
Executive Council.  (Plan § 1.1(9).)

property of [Delta]." (Confirmation Order ¶ 80; *see also id.*

¶ 79 (enjoining, pursuant to Section 524 of the Bankruptcy Code,

all holders of claims against Delta arising prior to the

Effective Date "from prosecuting or asserting any such

discharged Claim against . . . [Delta]").) The Confirmation

Order states:

> [A]ll holders of Claims . . . shall be precluded and
> enjoined from asserting against [Delta] . . . any
> other or further Claim or Interest based upon any act
> or omission, transaction or other activity of any kind
> or nature that occurred prior to the Effective Date,
> whether or not such holder has filed a Proof of Claim
> and whether or not the facts or legal bases therefore
> were known or existed prior to the Effective Date.

(Confirmation Order ¶ 78; *see also* Plan § 13.3.)

Notably, the Exculpation Clause applies to both Delta

and ALPA (*see* Confirmation Order ¶ 83; Plan § 13.5), whereas the

Discharge & Release Clause, as well as the Plan Injunction,

refer only to Delta and therefore do not cover ALPA's conduct.

(*See* Confirmation Order ¶¶ 78-80; Plan § 13.3.)

## V.    Equal Employment Opportunity Commission ("EEOC") Proceedings

On various dates beginning in March 2007,[28] plaintiffs,

---

[28] Although plaintiffs allege that they filed discrimination charges with the EEOC "beginning in or about the latter part of March of 2007" (Am. Compl. ¶ 243), the EEOC charges attached to Delta's motion papers indicate that the earliest EEOC charge was filed April 25, 2007. (*See* Doc. No. 43, Exs. 12, EEOC Discrimination Charge Filed by James Pieczko & 13, EEOC Discrimination Charges Filed by all Plaintiffs, except Leon Spinney (collectively, "EEOC Discrimination Charges").)

with the exception of plaintiff Leon Spinney,[29] filed

discrimination charges with the EEOC against both defendants

alleging violations of the ADEA stemming from ALPA's adoption of

the Claim Model.[30]  (Am. Compl. ¶¶ 186-88, 243-45; Tr. at 54.)

According to plaintiffs' Amended Complaint, each EEOC charge was

filed at least sixty days before plaintiffs brought suit in

federal court.  (Am. Compl. ¶¶ 189, 246.)  With regard to all of

the aforementioned charges, the EEOC issued "right-to-sue"

letters, the earliest of which was dated September 25, 2008.

(Am. Compl. ¶¶ 192, 249.)

     Although plaintiffs filed EEOC charges regarding the

---

[29] Plaintiffs allege that, although Leon Spinney did not file an EEOC charge, he was "victimized by the same pattern of discrimination and the same actions and omissions as were directed against each of the plaintiffs who filed such a charge and hereby adopts the same allegations as the plaintiffs who filed charges of discrimination." (Am. Compl. ¶ 247.)

[30] All of the EEOC charges state iterations of the following:

> On or about October 9, 2006, I became aware of an agreement between my employer and Delta Air Line Pilot's Association (Union).  That same day, the Union issued a claim Allocation Model which adversely impacts my retirement benefits and compensation package [and disability payments] under Letter #51.  In the Spring of 2007 [or between March and May of 2007], I received information regarding the specific terms of the Allocation Model regarding the forfeiture of benefits under Letter #51.

> No reasonable explanation has been given as to why older pilots will be negatively impacted by Letter #51.

> I believe that I have been discriminated against because of my age [ranging between 59-61], in violation of the Age Discrimination in Employment Act of 1967, as amended.

> I believe that Delta Air Line Pilots over the ages of 56 as a class are being treated less favorably than younger Delta Air Line Pilots due to stipulations set forth in Letter #51, in violation of the Age Discrimination in Employment Act of 1967, as amended.

(*See* EEOC Discrimination Charges.)

Claim Model, plaintiffs admittedly did not file charges of discrimination regarding the Notes Model.[31]  (Tr. at 50; *see also* EEOC Discrimination Charges.)

## VI.  **Plaintiffs' Claims Against ALPA & Delta**

### A. Claims Against ALPA: Counts I & III

Plaintiffs allege the following two claims against ALPA: (1) age discrimination under the ADEA under a disparate treatment theory; and (2) breach of contract.

#### 1. *ADEA Claim*

First, plaintiffs allege that ALPA violated the ADEA by developing two allocation models for the ALPA Claim and the Notes, which treated plaintiffs disparately on the basis of their age.  (Am. Compl. ¶¶ 173-96.)  To substantiate this claim, plaintiffs allege that they are within the protected age group as set forth in the ADEA, specifically 29 U.S.C. § 631(a),[32] that ALPA is a "labor organization" within the meaning of 29 U.S.C. § 630, and that ALPA's design of or acquiescence to a scheme to reduce compensation to Delta's oldest pilot employees constitutes a willful violation of the ADEA.  (*Id.* ¶¶ 174-75,

---

[31] Plaintiffs maintain, however, that the unfiled EEOC charges regarding the Notes Model were "reasonably related" to the filed EEOC charges regarding the Claim Model, such that the court has jurisdiction to hear the ADEA claims based on the Notes Model.  (Pl. Opp. to Delta at 12-14; Pl. Opp. to ALPA at 19-21; Doc. No. 51, Pl. Supplemental Letter Br. at 1-2.)

[32]  Title 29 U.S.C. § 631(a) provides that "[t]he prohibitions in this chapter, [the ADEA], shall be limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).

177.)

Specifically, as to the Claim Model, plaintiffs allege that ALPA engaged in a "pattern or practice of discriminating against certain pilots who are within the protected age group," specifically those closest to the then-mandatory retirement of sixty, "under the cloak of ostensible impartiality of the four 'metrics' and the forfeiture rules that were manufactured." (*Id.* ¶ 178.) According to plaintiffs, the oldest pilots who were required to forfeit their ALPA Claim allocation after their mandatory retirement date were the "*only* pilots whose ages precluded them from sharing appreciably in the distribution of the claim," and that the "forfeiture" provision applicable to them "targeted" older pilots for the benefit of younger pilots. (*Id.* ¶¶ 158, 180, 182.) Based on these foregoing allegations, plaintiffs allege that they have been "adversely affected" by ALPA's discriminatory allocation of the ALPA Claim. (*See id.* ¶ 183.)

As to the Notes Model, plaintiffs' factual allegations are sparse and difficult to comprehend. In four paragraphs in the middle of the Amended Complaint (*id.* ¶¶ 168-71), plaintiffs generally allege that they "reasonably understood . . . that the proceeds of the [N]otes would be distributed to those who lost monies based upon the termination of the defined benefit plan" but instead the "proceeds were paid to junior pilots who lost

nothing in the termination of the defined benefit plan, inasmuch as those pilots were being made whole by the PBGC."[33] (*Id.* ¶¶ 168-69.) Nowhere in the Amended Complaint do plaintiffs allege that they received less allocations than younger pilots from the Notes Model or that the plaintiffs, too, were not made whole by the PBGC. Instead, plaintiffs appear to take issue with the fact that the Notes Model allowed the younger pilots, whom plaintiffs allege had not yet "accrued lost pension benefits, inasmuch as the PBGC would reimburse such pilots for 100 percent of their lost benefits," to nonetheless receive a "substantial" portion of the Notes allocation. (*Id.* ¶¶ 170-71.) Thus, the court construes plaintiffs' allegations to be that the Notes Model was discriminatory because it allowed these younger pilots to share in the Notes allocation at all.

2. *Breach of Contract Claim*

Second, plaintiffs allege that ALPA breached its contract with Delta to develop methodology for the distribution of the proceeds[34] that was both "reasonable and lawful," and by

---

[33] Plaintiffs make no specific allegations involving the Notes Model in the paragraphs expounding on the allegations of ALPA's ADEA violation; these allegations revolve solely around the Claim Model. (*See generally* Am. Compl. ¶¶ 173-196.)

[34] As with the ADEA claim against ALPA, plaintiffs make no specific allegations involving the Notes Model in the paragraphs expounding on the allegations of ALPA's breach of contract claim. (*See* Am. Compl. ¶¶ 201-10.) To the contrary, plaintiffs' allegations revolve around Letter 51's "reasonable and lawful" language, which, as noted earlier, applies only to the Claim Model.

failing to do so, plaintiffs, as third party beneficiaries to the contract, were harmed. (*Id.* ¶¶ 201-10.) Specifically, plaintiffs allege that the "method of allocation" was "unreasonable" because the methodology targeted Delta's oldest pilots on the basis of age and therefore did "not adhere to a rationale rule for allocating the proceeds." (*Id.* ¶¶ 205-206.) Plaintiffs allege that the methodology was "unlawful" because it violated the ADEA, breached ALPA's duty of fair representation, disregarded a constructive trust, constituted a conversion of assets, breached ALPA's fiduciary duty, constituted a breach of contract and "may constitute a breach of an array of other lawful duties imposed upon [ALPA] under the attendant circumstances." (*Id.* ¶ 207.) According to plaintiffs, this "reasonable and lawful" requirement was a condition precedent to which ALPA was required to adhere. (*Id.* ¶ 204.) Thus, plaintiffs allege that they, as intended third-party beneficiaries to the contract between Delta and ALPA, were harmed by ALPA's contractual breach. (*Id.* ¶ 209.)

   B. Claims Against Delta: Counts VIII & X

        Plaintiffs allege the following two claims against Delta: (1) age discrimination under the ADEA under a disparate treatment theory; and (2) breach of implied contract.

        First, plaintiffs allege that Delta violated the ADEA by being "fully aware at each step of the way" of the allocation

methods adopted by ALPA but failing to take steps to assure that
ALPA treated Delta's "oldest, most experienced pilots . . .
better, or even equally, monetarily than younger, far less
experienced pilots . . . despite the fact that the oldest pilots
would be losing far more (in actual dollars or proportionately)
than any other segment of the pilot workforce." (*Id.* ¶¶ 251-
52.) To substantiate this claim, plaintiffs allege that Delta,
an "employer" within the meaning of 29 U.S.C. § 630, "simply
abandoned its oldest, most valuable pilot employees to the whims
of the much younger ALPA leadership and stood silently by as the
[ALPA leadership] decided to, predictably, leave the former with
virtually no economic protections after a lifetime of dedicated
service, in favor of the younger pilots," who "would reap a
windfall" from the older pilots' redistributed allocations.
(*Id.* ¶¶ 242, 253.)

Second, plaintiffs allege that Delta breached an
implied contract between Delta and its pilot employees. (*Id.*
¶¶ 261-65.) Specifically, plaintiffs assert that, although
Delta's contract with ALPA gave ALPA "exclusive authority" to
allocate and distribute the proceeds of the ALPA Claim and the
Notes, Delta retained a "non-delegable duty" to assure that ALPA
allocated the proceeds in a "reasonable" manner. (*Id.* ¶¶ 137,
262.) Plaintiffs therefore allege that Delta breached an
implied contract between Delta and its pilots that "Delta would

monitor the allocation of the Proceeds and assure that such allocation was accomplished in a reasonable manner, and, more to the point, in a manner that did not disenfranchise the oldest Delta pilots." (*Id.* ¶ 263.)

## DISCUSSION

### I. Standards of Review

#### A. Rule 12(b)(1)

Rule 12(b)(1) allows a district court to dismiss a case for lack of subject matter jurisdiction if the court "'lacks the statutory or constitutional power to adjudicate [the case].'" *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). Indeed, it is well-established that the plaintiff asserting subject matter jurisdiction has the burden of proving that jurisdiction exists by a preponderance of evidence when opposing a 12(b)(1) motion to dismiss. *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (citing *Makarova*, 201 F.3d at 113). In resolving a Rule 12(b)(1) motion to dismiss, the court "must accept as true all material factual allegations in the Amended Complaint, but will not draw inferences favorable to the party asserting jurisdiction." *Crayton v. Long Island R.R.*, No. 05-CV-1721, 2006 WL 3833114, at *3 (E.D.N.Y. Dec. 29, 2006).

B. Rule 12 (b)(6), Rule 8(a) and the Plausibility
   Standard

Rule 12(b)(6) allows for the dismissal of a cause of action if a plaintiff's complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8 (a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While Rule 8 "does not require 'detailed factual allegations[,]' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, factual allegations must consist of more than mere labels, legal conclusions, or a "'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[35] *Id.* (quoting *Twombly*, 550 U.S. at 570). In assessing whether a complaint states a plausible claim for relief, the Supreme Court has suggested a "'two-pronged approach.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at

---

[35] Plaintiffs incorrectly rely on the retired "no-set-of-facts test" in arguing that the defendants' motions to dismiss must be denied. (Pl. Opp. to Delta at 7; Pl. Opp. to ALPA at 7.)

1950).  First, a court should begin "by identifying pleadings
that, because they are no more than conclusions, are not
entitled to the assumption of truth."  *Iqbal*, 129 S. Ct. at 1950
"While legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations."  *Id.*
Second, "[w]hen there are well-pleaded factual allegations, a
court should assume their veracity and then determine whether
they plausibly give rise to an entitlement to relief."  *Id.*

The plausibility determination is "a context-specific
task that requires the reviewing court to draw on its judicial
experience and common sense."  *Id.*  A claim is plausible "when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged."  *Id.* at 1949.  Plaintiff's "[f]actual
allegations must be enough to raise a right to relief above the
speculative level" on the assumption that all of the complaint's
allegations are true.  *Twombly*, 550 U.S. at 555.

The plausibility standard does not require a showing
of a "probability" of misconduct, but it does demand more than a
"sheer possibility that a defendant has acted unlawfully."
*Iqbal*, 129 S. Ct. at 1949.  The plausibility standard is not met
where factual allegations, taken as true, are "'merely
consistent with' a defendant's liability," *id.* at 1949 (quoting
*Twombly*, 550 U.S. at 557), but are also "not only compatible

with, but indeed . . . more likely explained by, lawful . . .

behavior." *Id.* at 1950. Thus, where there is an "'obvious

alternative explanation'" that is more likely, the plaintiff's

cause of action is not plausible and must be dismissed. *Id.* at

1951 (quoting *Twombly*, 550 U.S. at 567); *see also Arar v.

Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009) (en banc)

(Allegations "become implausible when the court's commonsense

credits far more likely inferences from the available fact.").

However, a well-pleaded complaint may survive a motion

to dismiss even where "it strikes a savvy judge that actual

proof of those facts is improbable, and that a recovery is very

remote and unlikely." *Twombly*, 550 U.S. at 556 (citation and

internal quotation marks omitted). This is because the court's

function is "not to weigh the evidence that might be presented

at trial but merely to determine whether the complaint itself is

legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d

Cir. 1985).

In conducting such an assessment on a Rule 12(b)(6)

motion to dismiss, courts must "'accept as true all allegations

in the complaint and draw all reasonable inferences in favor of

the non-moving party.'" *Vietnam Ass'n for Victims of Agent

Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008)

(quoting *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92

(2d Cir. 2007)); *see also Starr v. Sony BMH Music Entm't*, 592

F.3d 314, 321 (2d Cir. 2010).

C.     Documents Properly Considered on 12(b)(1) and 12(b)(6)
       Motions to Dismiss

In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), courts may consider evidence outside of the pleadings.  *See Luckett*, 290 F.3d at 496-97 (citing *Makarova*, 201 F.3d at 113); *Thomas v. Metro. Corr. Ctr.*, No. 09-CV-1769, 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010).

Furthermore, in resolving a Rule 12(b)(6) motion to dismiss, courts may properly consider documents that are deemed included in, incorporated in, or integral to the complaint.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (noting that a court deciding a Rule 12(b)(6) motion may consider all documents included in the complaint whether by attachment, through incorporation by reference, or because the documents are integral to the pleading).  Indeed, courts may consider "the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit."  *Carter v. Safety-Kleen Corp.*, No. 06-CV-12947, 2007 WL 1180581, at *3 (S.D.N.Y. Mar. 14, 2007).  Courts may also "consider matters of which judicial notice may be taken under Fed. R. Evid. 201," including documents filed in other courts.  *See Kramer v. Time Warner*

*Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . ."); *see also Arista Records, Inc. v. Dalaba Color Copy Ctr., Inc.*, No. 05-CV-3634, 2007 WL 749737, at *4 n.1 (E.D.N.Y. Mar. 7, 2007). "'If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.'" *Vaughn v. Air Line Pilots Ass'n, Int'l*, 395 B.R. 520, 540 (E.D.N.Y. 2008), *aff'd*, 604 F.3d 703 (2d Cir. 2010) (quoting *Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

In total, ALPA[36] & Delta[37] submit for consideration nineteen exhibits that are external to the Amended Complaint. Because all of these exhibits are either matters of public record, matters filed in other courts, or documents integrally

---

[36] ALPA's documentary submissions include: 1) Letter 51; (2) the 2006 ADC Claim Dispatch; (3) the 2007 ADC Notes Dispatch; (4) relevant portions of the PWA; (5) relevant portions of Delta's 2007 Bankruptcy Reorganization Plan; and (6) relevant portions of the Bankruptcy Court's Confirmation Order approving Delta's Bankruptcy Plan. (*See* Doc. No. 41, Decl. of David M. Semanchik, Exs. 1-6.)

[37] Delta's documentary submissions include: (1) Delta's Notice of Bankruptcy; (2) relevant excerpts of Delta's Affidavit of Mailing; (3) Delta's Second Notice of Bankruptcy; (4) relevant excerpts of Delta's Affidavit of Mailing; (5) Affidavits of Publication relevant to Delta's Chapter 11 bankruptcy; (6) Letter 51; (7) the Bankruptcy Court's Approval Order Authorizing Debtors to Enter into Amendments to the PWA with ALPA; (8) the 2006 ADC Claims Dispatch; (9) the 2007 ADC Notes Dispatch; (10) the Bankruptcy Court's Confirmation Order approving Delta's Bankruptcy Plan; (11) Delta's Bankruptcy Reorganization Plan; (12) the EEOC Discrimination Charges filed by Plaintiff James Pieczko; and (13) the EEOC Discrimination Charges filed by all Plaintiffs except Leon Spinney. (*See* Doc. No. 43, Decl. of William H. Boice, Exs. 1-13.)

relied upon and referenced in the Amended Complaint, the court considered all of the defendants' submitted exhibits when resolving the defendants' 12(b)(6) motions to dismiss.[38] Consideration of the exhibits does not require the conversion of the motion into one for summary judgment.

D. Pleading Standard for ADEA Claims

There is no heightened pleading standard for employment discrimination cases. *Swierkiewicz v. Sorema*, *N.A.*, 534 U.S. 506, 512, 514-15 (2002) (Under Rule 8 of the Federal Rules of Civil Procedure, an employment discrimination complaint "must include only a short and plain statement of the claim . . . [that] give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."); *see also Twombly*, 550 U.S. at 547, 569-70 (explicitly affirming the *Swierkiewicz* pleading standard for employment discrimination claims.); *Iqbal*, 129 S. Ct. at 1953.

Accordingly, to overcome a motion to dismiss, a complaint in an ADEA case need not allege specific facts that establish a *prima facie* case of discrimination. *Swierkiewicz*, 534 U.S. at 515. However, "the complaint must be facially plausible and must give fair notice to the defendants of the

---

[38] Although plaintiffs summarily object to defendants' submissions as "go[ing] well beyond that which a Court should consider in a motion to dismiss" (Pl. Opp. to ALPA at 30), the court finds its reliance on these documents appropriate given plaintiffs' extensive reference to and reliance on these documents.

basis for the claim." *Morales v. Long Island R.R. Co.*, No. 09-CV-8714, 2010 WL 1948606, at *3 (S.D.N.Y. May 14, 2010); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010) (noting that, although *Twombly* and *Iqbal* did not impose a heightened pleading standard in employment discrimination cases, enough facts must still be pleaded to make plaintiff's claim plausible); *Doverspike v. Int'l Ordinance Techs.*, No. 09-CV-00473, 2010 WL 986513, at *5 (W.D.N.Y. Mar. 17, 2010) (same).

Although a plaintiff need not plead facts to establish a *prima facie* case of employment discrimination in order to survive a motion to dismiss, the court "considers the elements of a *prima facie* case in determining whether there is sufficient factual matter in the Complaint which, if true, give Defendant[s] fair notice of Plaintiff[s'] employment discrimination claims and the grounds on which such claims rest." *Doverspike*, 2010 WL 986513, at *4 (internal quotation marks omitted). Accordingly, in determining whether there is sufficient factual matter alleged to give defendants fair notice of plaintiffs' ADEA claims, the court liberally construes the Amended Complaint with an eye toward the elements of a *prima facie* case of employment discrimination under the ADEA: (1) plaintiffs are members of a protected class; (2) plaintiffs were qualified to receive the employee benefits in question; (3) plaintiffs suffered an adverse employment action; and (4) the

circumstances surrounding the challenged action give rise to an inference of age discrimination. *Vaughn*, 395 B.R. at 540-41; *see also Doverspike*, 2010 WL 986513, at *4.

## II. <u>Analysis</u>

### A. <u>The Bankruptcy Confirmation Order & Plan</u>

As a threshold matter, ALPA and Delta argue that plaintiffs' claims are barred by the Bankruptcy Confirmation Order and Plan. Delta contends that plaintiffs' claims are barred under the Exculpation Clause and the Discharge and Release Clause in the Confirmation Order and Plan.[39] (Delta Mot. at 14-21.) As the Discharge and Release Clause does not apply to ALPA, ALPA contends that plaintiffs' claims are barred only under the Exculpation Clause. (ALPA Mot. at 26-29.)

In response, plaintiffs argue that the Exculpation Clause contains an exception for "willful misconduct" and that the Amended Complaint contains allegations that both Delta and ALPA acted willfully are therefore outside of the protective scope of the Exculpation Clause. (*See* Doc. No. 46, Pls.' Mem. in Opp. to Delta's Mot. to Dismiss ("Pl. Opp. to Delta") at 16-18; Doc. No. 45, Pls.' Mem. in Opp. to ALPA's Mot. to Dismiss

---

[39] Delta also contends that plaintiffs' claims amount to a collateral attack on the Confirmation Order and Plan, and are accordingly precluded by the *res judicata* effect of the Bankruptcy Court's Order, which constitutes a final judgment on the merits. (Delta Mot. at 14-15.) However, because the court finds that plaintiffs' claims against Delta are barred by the Discharge and Release and by the Exculpation Clause, the court need not address Delta's *res judicata* argument.

("Pl. Opp. to ALPA") at 30-31.)  Plaintiffs offer no response to

Delta's argument that all of plaintiffs' claims against Delta

are barred by the Discharge and Release Clause.  (Pl. Opp. to

Delta at 16-18.)

    1. *Discharge & Release Clause*

        The Confirmation Order and Plan's Discharge & Release

Clause, applicable to Delta, but not ALPA, provides that "upon

the Effective Date [April 30, 2007], all existing Claims against

[Delta] . . . shall be, and shall be deemed to be, discharged

and terminated."  (Confirmation Order ¶ 78; Plan § 13.3.)  Under

this discharge provision, each holder of a claim against Delta

"is deemed to have forever waived, released and discharged

[Delta], to the fullest extent permitted by Section 1141 of the

Bankruptcy Code, of and from any and all Claims, Interests,

rights and liabilities that arose prior to the Effective Date."

(Confirmation Order ¶ 79; Plan § 13.3.)

        Under Section 1141 of the Bankruptcy Code, a

bankruptcy court's confirmation of a reorganization plan

discharges the debtor from any debt that arose before the date

of the confirmation, regardless of whether proof of the debt is

filed, the claim is disallowed, or the plan is accepted by the

holder of the claim.  11 U.S.C. § 1141(d)(1)(A).  "A 'debt' is

defined to mean 'liability on a claim,'" and "a 'claim' is

defined to include any 'right to payment, whether or not such

right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'"  *In re Worldcom, Inc.*, 546 F.3d 211, 216 (2d Cir. 2008) (quoting 11 U.S.C. §§ 105(A)(5) and (12)).

Thus, the Discharge and Release Clause covers all debts and claims that existed before April 30, 2007, the Effective Date of the Plan.  (Confirmation Order ¶ 78; Plan § 13.3.)  Accordingly, the applicability of the Discharge and Release Clause to the plaintiffs' claims against Delta hinges primarily upon the court's determination of whether the plaintiffs' claims arose prior to April 30, 2007.

A claim arises, for the purposes of discharge in bankruptcy cases, at the "time of the events giving rise to the claim, not at the time the plaintiff is first able to file suit on the claim."  *Carter*, 2007 WL 1180581, at *4-5 (internal quotation marks and citation omitted).  Moreover, when determining whether a claim arises before or after the date of the Bankruptcy Plan's confirmation, courts must look to the relevant non-bankruptcy law that serves as the basis for the claim, namely, employment discrimination law, breach of contract law, and, as will be discussed, *infra*, law surrounding hybrid claims for breaches of collective bargaining agreements and of the duty of fair representation.  *See, e.g., In re Manville*

38

*Forest Prods. Corp.*, 209 F.3d 125, 128 (2d Cir. 2000).

In employment discrimination cases, a claim is deemed to arise "on the date the employee learns of the employer's discriminatory conduct." *Flaherty v. Metromail Corp.*, 235 F.3d 133, 137 (2d Cir. 2000); *see also Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993). Further, a cause of action for breach of contract under New York law accrues when the contract is breached. *Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 502, 615 N.E.2d 985, 986 (1993). Moreover, a breach of contract claim premised on an employer's breach of the collective bargaining agreement and on a union's breach of its duty of fair representation is "apparent to the [plaintiff] at the time [plaintiff] learns of the union action or inaction about which she complains." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir. 1989); *see also Cohen v. Flushing Hosp. & Med. Ctr.*, 68 F.3d 64, 67 (2d Cir. 1995) ("[I]t is well settled that [a hybrid cause of action for a breach of collective bargaining agreement against an employer and breach of duty of fair representation claim against a union] accrue[s] no later than the time when plaintiffs knew or reasonably should have known that such a breach . . . had occurred." (internal citations and quotation marks omitted)); *see also Welyczko v. U.S. Air, Inc.*, 733 F.2d 239, 241 (2d Cir. 1984), *cert. denied*, 469 U.S. 1036 (1984)

39

(six-month federal statute of limitations applicable to hybrid actions under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.*, is also applicable to hybrid claims under the RLA).

    a. The Claim Model

Here, plaintiffs' claims against Delta based upon the ALPA Claim arose after Delta filed its Chapter 11 petition and prior to the Effective Date of the Plan. The 2006 ADC Claim Dispatch, which notified plaintiffs of the details of the allegedly "unreasonable" and "unlawful" method of allocation of the ALPA Claim, was circulated on October 9, 2006, approximately seven months before the Effective Date of the Plan. (Am. Compl. ¶ 143; Claim Dispatch at 1.) As such, plaintiffs learned about Delta's alleged discrimination and breach of implied contract based upon the ALPA Claim prior to the Effective Date of the Plan. Indeed, plaintiffs allege that they filed EEOC charges of discrimination against ALPA and Delta before the Effective Date of the Plan.[40] (Am. Compl. ¶¶ 243-44.) However, plaintiffs never raised these claims before the Bankruptcy Court in any form, despite the fact that they were on notice to do so in order to preserve their claims.

---

[40] As noted, plaintiffs allege that they filed EEOC charges as early as March 2007, approximately one month before the Effective Date of the Plan. (Am. Compl. ¶¶ 243-44.) The EEOC charges attached to Delta's papers indicate that the earliest EEOC charge was filed April 25, 2007, five days prior to the Effective Date of the Plan. (*See* EEOC Discrimination Charges.)

Accordingly, on April 30, 2007, all of plaintiffs' claims against Delta arising out of the establishment and implementation of the Claim Model were barred, discharged, terminated, and enjoined by the Discharge and Release Clause and Plan Injunction in the Confirmation Order and Plan and the injunction provisions set forth in sections 1141(d) and 524(a) of the Bankruptcy Code. *See* 11 U.S.C. §§ 524(a), 1141(d); *see, e.g.*, *Carter*, 2007 WL 1180581, at *5 (finding plaintiff's discrimination claim, which the court found to arise prior to the confirmation of the debtor's plan of reorganization, to be discharged under the under the terms of the Reorganization Plan and by the Bankruptcy Code); *see also Garland v. U.S. Airways Inc.*, 270 Fed. Appx. 99, 101-02 (3d Cir. 2008) (discrimination claims against airline based on plaintiff's termination were discharged by confirmation of U.S. Airways' bankruptcy reorganization plan and by the Bankruptcy Code); *Long v. Delta Air Lines, Inc.*, No. 5:08-CV-00210, 2009 WL 5198092, at *3-4 (W.D. Ky. Dec. 23, 2009) (finding plaintiff's discrimination claims against Delta to be discharged by the confirmation of Delta's reorganization plan, effective April 30, 2007, and that plaintiff was enjoined from bringing any action against Delta regarding any claims that arose prior to April 30, 2007).

b. Notes Model

Plaintiffs' claims against Delta arising from the

Notes present a more difficult question.  Although acknowledging
that the plaintiffs first learned of the Notes Model in August
2007, Delta argues that the claims based upon the Notes Model
"existed" prior to the Effective Date of the Plan and were
similarly discharged.  (Doc. No. 44, Reply Br. in Support of
Def. Delta Air Lines, Inc.'s Mot. to Dismiss ("Delta Reply") at
4 ("[T]o the extent Plaintiffs' claims against Delta are based
on the agreement to allow ALPA to determine the [Notes] model,
they arose from Bankruptcy Letter # 51, and where thus also
discharged.").)

          Delta's argument is without merit.  In both employment
discrimination cases and breach of contract cases premised on
breaches of a collective bargaining agreement, a claim arises
when the employee gains knowledge about the allegedly unlawful
or discriminatory action or inaction.  *Flaherty*, 235 F.2d at
137; *Ghartey*, 869 F.2d at 165.  In state-law breach of contract
cases, a claim arises when the contract is breached.  *Ely-
Cruikshank Co.*, 81 N.Y.2d at 402, 599 N.Y.S.2d at 502, 615
N.E.2d at 986.  ALPA informed the Delta pilots of the Notes
Model through the ADC Notes Dispatch on August 9, 2007, more
than three months after the April 30, 2007 discharge date.
(Notes Dispatch at 1.)  Moreover, Delta concedes that plaintiffs
did not have a chance to review their Notes allocations until
August 28, 2007.  (*See* Delta Mot. at 9.)

Accordingly, plaintiffs' claims based upon the Notes Model did not arise until plaintiffs could reasonably be expected to learn about the details of the Notes allocation method: at the earliest August 9, 2007, the date of the ADC Notes Dispatch. Because the August 9, 2007 ADC Notes Dispatch post-dates the Effective Date of the Plan, the court finds that plaintiffs' age discrimination claim and breach of implied contract claim against Delta arising from the Notes are not barred by the Discharge and Release Clause.

2. *Exculpation Clause*

Exculpation clauses are properly considered in a Rule 12(b)(6) motion to dismiss. *In re BH S & B Holdings LLC*, 420 B.R. 112, 145 (Bankr. S.D.N.Y. 2009) ("The Court may take judicial notice of an exculpatory provision at the motion to dismiss stage."); *see also Nisselson v. Lernout*, 568 F. Supp. 2d 137, 149 (D. Mass. 2008) (dismissing complaint on a 12(b)(6) motion when plaintiff failed to plead claims of non-exempt conduct with sufficient particularity to permit the court to reasonably conclude the conduct falls outside the exemption to the exculpation provision).

The Exculpation Clause contained in the Confirmation Order and Plan shields both ALPA and Delta from incurring liability "to any holder of a Claim . . . for any act or omission in connection with, related to or arising out of, the

Chapter 11 Cases, . . . the offer, issuance and distribution of any securities issued or to be issued pursuant to the Plan . . . or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, ultra vires acts or gross negligence." (Confirmation Order ¶ 83; Plan § 13.5.)

Defendants contend that the Exculpation Clause is both retrospective and prospective and that, as plaintiffs' age discrimination and contract claims against them clearly fall within the purview of events covered by the Exculpation Clause, these claims are barred. (*See* Delta Mot. at 15-17; Delta Reply at 4-5; ALPA Mot. at 27-28.) Specifically, defendants argue that plaintiffs are holders of Claims, as defined under the Confirmation Order and Plan, and that these claims center chiefly upon the defendants' alleged actions, inactions, and duties relating to and arising directly from Letter 51, a modification of the pilots' collective bargaining agreement negotiated so that Delta could emerge from bankruptcy, which was incorporated into the Bankruptcy Court's Plan and approved by the Confirmation Order. (*See* Delta Mot. at 15-17; Delta Reply at 4-5; ALPA Mot. at 27-28; *see also* Am. Compl. ¶ 129.) The defendants therefore argue that the acts or omissions alleged by plaintiffs arise out of "the Chapter 11 Cases" under the purview of the Exculpation Clause. (*See* Delta Mot. at 15-17; Delta

44

Reply at 4-5; ALPA Mot. at 27-28.)  Furthermore, the defendants

argue that the allocation models developed to distribute the

ALPA Claim and the Notes constitute issues of administration of

Letter 51, an integral part of the Bankruptcy Plan, and that the

ALPA Claim and the Notes, which are either securities or stock

convertible into cash, constitute securities and property to be

distributed under the Plan.  (Delta Mot. at 15-17; Delta Reply

at 4-5; ALPA Mot. at 27-28; *see also* Plan §§ 1.1(7), 1.1(163),

1.1(164), 4.2(d), and 6.14.)  Thus, defendants argue, and the

court agrees, that plaintiffs' age discrimination and breach of

contract claims fall squarely within the substantive coverage of

the Exculpation Clause.[41]  Defendants further argue that

plaintiffs' conclusory allegations that defendants' actions

amount to "willful misconduct" are insufficient to except

plaintiffs' claims from the scope of the Exculpation Clause for

purposes of the motion to dismiss.  (Delta Mot. at 18; Delta

Reply at 4-5; ALPA Mot. at 28-29; Doc. No. 40, Reply Mem. of Law

in Further Supp. of Mot. to Dismiss of ALPA and Prater ("ALPA

Reply") at 9.)

---

[41] Plaintiffs' unsubstantiated argument that their claims against defendants
are not necessarily "in connection with, related to, or arising out of, the
Chapter 11 Cases" is mistaken.  (Pl. Opp. to ALPA at 30-31; Pl. Opp. to Delta
at 17.)  It is clear from the allegations in the Amended Complaint that the
allocation methodologies of which plaintiffs complain arose from Delta's
Chapter 11 case, the offer, issuance and distribution of any securities
issued pursuant to the Plan and/or the administration of the Plan or the
property to be distributed under the Plan.  (*See, e.g.*, Am. Compl. ¶¶ 99-
172.)

In response to defendants' arguments, plaintiffs contend that: (1) plaintiffs' claims are not barred by the Exculpation Clause because plaintiffs have properly alleged that ALPA's and Delta's conduct constitutes willful misconduct;[42] and (2) the Exculpation Clause is retrospective only, so that even if it applied to plaintiffs' claims, it would only absolve the defendants from liability for conduct which occurred prior to the Effective Date of April 30, 2007. (Pl. Opp. to Delta at 16-18; Pl. Opp. to ALPA at 30-31.)

    a.    Retrospective Nature of Exculpation Clause

Defendants argue that the text of the Exculpation Clause is both prospective and retrospective in nature and therefore shields both ALPA and Delta from liability related to or arising out of the development of both the Claim Model and the Notes Model. (Delta Mot. at 16-17; ALPA Mot. at 27-28.) Plaintiffs, on the other hand, argue that the Exculpation Clause protects against retrospective actions only, and thus would not exculpate defendants from their liability related to or arising out of the development of the Notes Model.[43] (Pl. Opp. to Delta

---

[42] In their Amended Complaint and in their Opposition to ALPA and Delta's motions to dismiss, plaintiffs claim only that Delta's and ALPA's conduct constitute willful misconduct and make no claim that defendants' conduct constitutes gross negligence or ultra vires acts. (*See generally* Am. Compl.; Pl. Opp. to Delta at 16-18; Pl. Opp. to ALPA at 30-31.) Thus, the court addresses only plaintiffs' claims of willful misconduct.

[43] Delta acknowledges that "each pilot was able to view his Notes allocation as of August 28, 2007," approximately three months after the April 30, 2007

at 16-18; Pl. Opp. to ALPA at 30-31.)

The court declines to adopt plaintiffs' interpretation of the Exculpation Clause. First, the Exculpation Clause, which shields Delta and ALPA from "any liability" for, *inter alia*, "any act or omission in connection with, related to or arising out of . . . the administration of [Delta's] Plan [of Reorganization]," contains no explicit limitation regarding the temporal genesis of that alleged liability. (Confirmation Order ¶ 83; *see also* Plan § 13.5.) Further, the language of the clause itself is prospective in nature, as it exculpates the parties from liability arising out of "the administration of the Plan," including securities "to be issued pursuant to the Plan," and "property to be distributed under the Plan." (Confirmation Order ¶ 83; *see also* Plan § 13.5.) As courts in this circuit have noted, limiting the scope of the Exculpation Clause to actions occurring only prior to the Effective Date "would render the 'administration of the Plan' clause meaningless, because conduct during the administration of the Plan necessarily occurs after the effective date of the Plan." *In re Flushing Hosp. and Med. Center*, 395 B.R. 229, 235 (Bankr. E.D.N.Y. 2008) (holding that an exculpatory clause in a bankruptcy order, which shielded the debtor from liability arising out of "administration of the

_____

Effective Date. (Delta Mot. at 9.)

[Bankruptcy] Plan," covered acts and omissions occurring after the Effective Date of the Plan). Thus, the court finds that the Exculpation Clause contained in the Confirmation Order and Plan covers all liability stemming from the allocation of the ALPA Claim and the Notes, notwithstanding the fact that the distribution of the Notes occurred subsequent to the Effective Date of Delta's Bankruptcy.[44] *See id*.

Accordingly, unless an exception to the Exculpation Clause applies, plaintiffs' claims against defendants arising from both the ALPA Claim and Notes Models are barred by the Exculpation Clause contained in the Confirmation Order and Plan.

b.    Definition of "Willful Misconduct"

Neither the Confirmation Order nor the Plan defines the term "willful misconduct," as used in the exception to the Exculpation Clause. Courts interpreting "willful misconduct" in exculpation clauses with similar language to the clause in this case have defined the term as "intentional" conduct. *See, e.g.*, *Sabella v. Scantek Med., Inc.,* No. 08-CV-543, 2009 WL 3233703, at *12 (S.D.N.Y. Sept. 25, 2009) (holding that because "there is

---

[44] The plaintiffs point out that the *In re Flushing Hosp. and Med. Center* court held, on a motion for summary judgment, that there were questions of fact as to whether the debtor's conduct excepted it from the scope of the Exculpation Clause. (Pl. Opp. to Delta at 17-18 (quoting *In re Flushing Hosp. and Med. Center*, 395 B.R. at 236).) As will be discussed, *infra*, however, the court finds the plaintiffs' allegations of the defendants' willful misconduct are insufficient to exclude Delta and ALPA from the scope of the Exculpation Clause.

no suggestion that the term ['willful misconduct' as used in exculpation clause] is ambiguous, 'willful misconduct' will be given its ordinary meaning, which is 'Misconduct committed voluntarily and intentionally.'" (citing Black's Law Dictionary (8th ed. 2004)); *see also* Black's Law Dictionary (8th ed. 2004) (defining "misconduct" as "[a] dereliction of duty; unlawful or improper behavior"); *Mansfield v. Air Line Pilots Ass'n Int'l*, Nos. 06-C-6869, 07-C-590, 2007 WL 2048664, at *3 (N.D. Ill. July 9, 2007) (on motion to dismiss, analyzing similar exculpation clause exempting "willful misconduct" from purview and concluding that "[t]he words 'intentional' and 'willful' are synonyms, for all practical purposes." (citing *Webster's Third New Int'l Dictionary* 2617 (1993))).

Relying on Supreme Court cases analyzing willful violations of the ADEA, plaintiffs argue that "willful" conduct occurs where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." (Pl. Opp. to ALPA at 31 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); Pl. Opp. to Delta at 16 (same)); *accord Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617 (1993) (analyzing § 7(b) of the ADEA and concluding that a violation of the ADEA would be "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [ADEA]); *Trans World Airlines,*

*Inc. v. Thurston*, 469 U.S. 111, 126 (1985) (same); *Benjamin v. United Merchants and Mfrs., Inc*., 873 F.2d 41, 44 (2d Cir. 1989) (same).  Plaintiffs therefore contend that the knowing or reckless disregard standard from ADEA cases should be imported into the definition of "willful misconduct" found in the Exculpation Clause.  Defendants do not dispute this argument or offer an alternate definition of "willful misconduct."

Accordingly, the court adopts plaintiffs' proffered definition of "willful misconduct."  However, because plaintiffs do not argue that the "knowing or reckless disregard" standard is also applicable to willful breaches of contract and because the case law cited in support of the plaintiffs' "knowing or reckless disregard" standard is limited to violations of the ADEA, the court limits the application of this standard to analysis of plaintiffs' ADEA claims.  The court applies the "intentional" standard in its analysis of plaintiffs' breach of contract claims.

       c.    Allegations of Delta's Willful Misconduct

In order to withstand Delta's motion to dismiss, plaintiffs argue that the Amended Complaint contains sufficient allegations regarding Delta's willful participation in the allegedly unlawful and unreasonable allocation of the proceeds so that their claims against Delta are not barred by the

Exculpation Clause.[45]  (Pl. Opp. to Delta at 16-18.)  Plaintiffs

point to three allegations in the Amended Complaint to

substantiate their claims of Delta's "willful misconduct": 1)

that Delta "abandoned its oldest, most valuable pilot employees

to the whims of the much younger ALPA leadership; (2) that Delta

"stood silently by" as the younger pilots disenfranchised the

older pilots; and (3) that Delta's discriminatory actions were

"willful and unwarranted."[46]  (Pl. Opp. to Delta at 16 (citing

Am. Compl. ¶¶ 253, 255).)  Notably, these conclusory

allegations, unsupported by factual allegations, are all made in

connection with the ADEA disparate treatment claim against

Delta.  The Amended Complaint contains no allegations of willful

misconduct in connection with the breach of implied contract

claim against Delta, and plaintiffs fail to point the court to

any portions of the Amended Complaint from which such conduct

can be inferred.  Plaintiffs further urge this court to "allow

---

[45] Because the court finds all claims against Delta based on the Claim Model
to be discharged, it only addresses plaintiffs' allegations as to Delta's
willful misconduct in regard to the development of the Notes Model.

[46]  Although plaintiffs argue in their Opposition that the Amended Complaint
contains allegations that "Delta" engaged in "willful and unwarranted
discriminatory actions," the Amended Complaint's only explicit reference to
"willful" action with regard to plaintiffs' remaining claims against Delta
center upon the "Union's willful and unwarranted discriminatory actions," not
Delta's.  (Am. Compl. ¶ 255.)  The court notes that plaintiffs may have
mistakenly named "the Union" in paragraph 255 of the Amended Complaint,
instead of Delta.  Regardless of its intended subject, plaintiffs' use of the
word "willful" is conclusory, and is therefore not taken as true.  *Iqbal,* 129
S. Ct. at 1950 (Pleadings which are no more than conclusions, are "not
entitled to the assumption of truth.")  Further, plaintiffs voluntarily
dismissed Count IX, the only count in the Amended Complaint which contains an
explicit allegation that Delta acted "willfully."  (Am. Compl. ¶ 259.)

plaintiffs the opportunity to pursue the claims against Delta at least in order to determine whether Delta acted negligently or willfully." (Pl. Opp. to Delta at 16.)

First, assuming the truth of plaintiffs' non-conclusory allegations, the Amended Complaint fails to allege sufficient facts to establish a plausible showing of Delta's willful misconduct with regard to the Notes Model. *See Twombly*, 555 U.S. at 570; *Iqbal*, 129 S. Ct. at 1950. There are no allegations to suggest that Delta acted with discriminatory intent, directed ALPA to allocate the Notes in an unreasonable, unlawful or discriminatory manner, played any part in developing or approving the Notes Model, or that Delta knew of or recklessly disregarded the possibility that the allocations made under ALPA's Notes Model violated the ADEA.

The thrust of plaintiffs' allegations is that ALPA, not Delta, through its MEC and ADC, developed an allocation method which allowed for "junior pilots who lost nothing in the termination of the defined benefit plan" because the PBGC would make them "whole" to receive "substantial" portions of the Notes allocation. (Am. Compl. ¶¶ 169, 171.) Plaintiffs generally allege that Delta, who was aware of "the manner in which" ALPA determined the Notes "would be allocated among its pilot employees," failed to take steps "to assure that its oldest, most experienced pilots were treated better, or even equally,

monetarily than [its] younger, far less experienced pilots . .

., despite the fact that oldest pilots would be losing far more

(in actual dollars or proportionately) than any other segment of

the pilot workforce." (*Id.* ¶¶ 251-52; *see also* Delta Mot. at

23-24.)

As discussed, meeting the plausibility standard

requires a complaint to plead facts that show "more than a sheer

possibility that a defendant has acted unlawfully" and a

complaint that only pleads facts that are "'merely consistent

with' a defendant's liability. . . 'stops short of the line

between possibility and plausibility of entitlement to relief.'"

*Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs' allegations that they did not receive

proportionately more allocation under the Notes Model than the

younger pilots (Am. Compl. ¶¶ 168-71), and that Delta did

nothing to rectify this alleged inequity falls short of a

plausible showing that Delta intentionally or knowingly violated

the ADEA, that Delta showed reckless disregard for whether its

conduct violated the ADEA, or that Delta intentionally breached

an implied contract. *See, e.g.*, *Benjamin*, 873 F.2d at 44

("[T]here is no liability for [a willful violation of the ADEA]

when a plaintiff proves only that the employer acted

negligently, inadvertently, innocently, or even, if the employer

was aware of the applicability of the ADEA, and acted reasonably

and in good faith.")

Indeed, the factual allegations contained in the Amended Complaint fail to plausibly suggest that the Notes Model itself was discriminatory or unreasonable. Quite the opposite, the allegations in the Amended Complaint and the ADC Notes Dispatch make clear that the Notes Model, which determined allocations based on the greater of the amount lost from the termination of the Plan, or alternatively, on years of service, necessarily rewarded older pilots, such as plaintiffs, who had worked for Delta for longer than the younger pilots. Further, the allegations in the Amended Complaint and the ADC Notes Dispatch suggest that any disparities between the older and younger pilots' proportional recovery under the Notes Model were the result of the discrepancy between the ADC's predicted valuation and the actual valuation of the PBGC claim and, thus, contradict plaintiffs' allegations of discriminatory animus based on the older pilots' age.[47]  (*See* Notes Dispatch at 6; Am.

---

[47] As noted, *supra*, the value that the PBGC would place on its $2.2 billion unsecured claim was unknown at the time the Notes Model was developed. (Notes Dispatch at 6.)  The ADC therefore set a projected "*Model-defined* recovery ratio" for all pilots of 45 cents on the dollar for the PBGC's unsecured claim.  However, the Amended Complaint alleges that younger pilots were made whole by the PBGC.  (Am. Compl. ¶¶ 169-70 ("[T]he PBGC would reimburse such pilots for 100 percent of their lost benefits.").)  Thus, the discrepancy between the ADC's estimated valuation and the actual valuation of the PBGC claim appears to have resulted in younger pilots being fully compensated by the PBGC distribution as opposed to only receiving 45 cents on the dollar as originally projected by the Notes Model.  However, ALPA's failure to anticipate the PBGC's ultimate valuation of its claim cannot be attributed to discriminatory animus based on the older pilots' age.

Compl. ¶¶ 168-71.)  Plaintiffs have not alleged that they
received less allocation from the Notes Model than younger
pilots or that the PBGC failed to make them whole, nor does the
record before the court indicate that such allegations could be
made.  Indeed, the record indicates that the Notes Model
actually benefitted plaintiffs.  Thus, plaintiffs' ADEA and
breach of implied contract claims based on the discriminatory
and unreasonable nature of the Notes Model must fail.  *See,
e.g.*, *Vaughn*, 395 B.R. at 541-43 (granting motion to dismiss
disparate treatment ADEA claim where plaintiffs' sole
allegations of adverse employment action was that younger pilots
would receive more retirement benefits than older pilot
plaintiffs under the pension plans where one pension plan
required greater contributions to older pilots' plans and the
other plan was age-neutral, reasoning that "is clear that the
differences between older and younger pilots' ultimate
retirement benefits is the result of basic economics,
specifically the time value of money, and is not related to the
older pilots' age").  Accordingly, the allegations in the
Amended Complaint fail to state a plausible claim for Delta's
willful misconduct premised on the development of the Notes
Model.  *See Twombly*, 555 U.S. at 555.

Further, as plaintiffs have not supported their
conclusory allegations with facts sufficient to render the

allegations of Delta's willful misconduct plausible, they are not entitled to engage in discovery in order to determine whether they can allege a plausible claim.[48]  *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004) ("[D]iscovery is authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim.").  Thus, the court finds the Exculpation Clause bars plaintiffs' ADEA and implied contract claims against Delta stemming from the allocation of the Notes, and all claims against Delta are dismissed.

> d.    Allegations of ALPA's Willful Misconduct

In opposition to ALPA's motion to dismiss, plaintiffs argue that because the Amended Complaint sufficiently pleads allegations regarding ALPA's willful participation in the allegedly unlawful and unreasonable allocation of the ALPA Claim and the Notes, its claims are not barred by the Exculpation Clause.  (Pl. Opp. to ALPA at 30-31.)  Arguing that they have sufficiently pleaded willful misconduct against ALPA, plaintiffs direct the court's attention to their two allegations that ALPA

---

[48] Indeed, at oral argument, in response to repeated requests from this court to point to allegations in the Amended Complaint which take plaintiffs' bare allegations beyond the speculative level, plaintiffs' counsel conceded that, "with regard to Delta, Your Honor, to be completely frank, we know a lot less than we do about the union, because Delta gave that responsibility to the union.  You know, I'm conceding that, that as against Delta, you know, we don't know precisely what happened and how it happened."  (Tr. at 46.)

acted "willfully," and, generally, to the allegations made in connection with ALPA's alleged age discrimination and breach of contract claims. (*Id*. at 31.) Finally, plaintiffs contend that the Amended Complaint contains an "array of allegations that, taken together, suggest a brazen attitude by" ALPA in its determination of the Claim and Notes Models.[49] (*Id*.) Notably, all explicit references to ALPA's "willful" misconduct found in the Amended Complaint are alleged only in support of plaintiffs' ADEA disparate treatment claim; there are no explicit allegations of willful misconduct in connection with the breach of contract claim.

Given plaintiffs' allegations that the forfeiture provision in the Claim Model was developed to account for the inability of pilots turning 60 to work for the full term of the concessionary period and that the MEC waived the forfeiture provision for 140 out of 170 pilots who had not mandatorily retired before FTEPA's enactment, the court finds that the Amended Complaint contains insufficient factual allegations to render plausible ALPA's alleged willful violation of the ADEA and breach of contract based on the Claim Model. Likewise, for the reasons noted above, plaintiffs have insufficiently pleaded

---

[49] Plaintiffs also argue that their claim for conversion is "an intentional tort, which by definition, requires willfulness." (Pl. Opp. to ALPA at 30-32.) The conversion claim, however, has been voluntarily dismissed. (*See* Stip. ¶ 5.)

a plausible claim willful misconduct in connection with the

Notes Model.  However, even if the court found plausible

plaintiffs' allegations of ALPA's willful misconduct,

plaintiffs' claims against ALPA are dismissed on other grounds.

   B. Plaintiffs' Claims Against ALPA

        1. ADEA Claim

        ALPA argues that plaintiffs' ADEA claim should also be

dismissed as a matter of law because plaintiffs seek monetary

damages, which are unavailable in ADEA claims against a union

under controlling Second Circuit precedent.  (ALPA Mot. at 16-

17.)  In response, plaintiffs ignore controlling Second Circuit

law and instead rely on cases outside the Second Circuit holding

that monetary damages may be recoverable against a labor union

under the ADEA, and urge the court to follow the reasoning of

those courts, because, *inter alia*, barring money damage awards

leaves discrimination victims without a remedy.  (Pl. Opp. to

ALPA at 13-16 (citing *Tyrrell v. City of Scranton*, 134 F. Supp.

2d 373, 385-87 (M.D. Pa. 2001).)  Alternatively, plaintiffs

argue that ALPA may be viewed as an indirect or *de facto*

employer subject to monetary damages under the ADEA and that

ALPA can be liable under the ADEA via an "aiding and abetting"

theory of liability.  (Pl. Opp. to ALPA at 11-13; *see also* Pl.

Supplemental Letter Br. at 3.)

        The Second Circuit, interpreting the remedies

available under the ADEA in *Air Line Pilots Ass'n. Int'l v. Trans World Airlines Inc.*, held that the ADEA does not permit the recovery of monetary damages against a labor organization. 713 F.2d 940, 957 (2d Cir. 1983), *aff'd in part, rev'd in part*, 469 U.S. 111 (1985). Specifically, the Second Circuit held:

> ALPA argues that the remedial scheme of the ADEA, which incorporates that of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-218, does not permit actions to recover monetary damages, including back pay, against a labor organization. We agree. Under the FLSA employees may bring actions to recover money damages against employers, *id.* §216(b), and the term "employer" in FLSA expressly excludes labor organizations. *Id.* § 203(d). This express statutory incorporation of FLSA precludes a monetary damage or back pay award against ALPA. Appellants are therefore only entitled to injunctive relief against the union.

*Id.* at 957 (internal citations omitted). The Supreme Court subsequently declined to address the issue, finding that it was "without jurisdiction to consider this question." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 119 n.14 (1985).

Although, as plaintiffs point out, courts in other circuits have held that unions can be liable for money damages under the ADEA, courts in this circuit continue to follow the Second Circuit's decision in *Trans World Airlines Inc.*, and have reaffirmed that "[u]nder the caselaw in the Second Circuit interpreting the remedies available under the ADEA, monetary damages, including liquidated damages and back pay, are not recoverable against a labor union." *Cipriano v. Bd. of Educ. of*

*City School Dist. of City of N. Tonawanda*, 700 F. Supp. 1199,
1213 (W.D.N.Y. 1988), *vacated on other grounds*, 772 F. Supp.
1346 (W.D.N.Y. 1991), *aff'd,* 968 F.2d 1502 (2d Cir. 1992); *see
also Parker v. Metro. Transp. Auth.*, 97 F. Supp. 2d 437, 448
(S.D.N.Y. 2000) ("[M]oney damages are not available against
labor organizations under the ADEA."); *Gabarczyk v. Bd. of Educ.
of City School Dist.*, 738 F. Supp. 118, 125 n.3 (S.D.N.Y. 1990)
("Under the ADEA, monetary damages, including liquidated damages
and back pay, are not recoverable against a labor union.").
Thus, this court adheres to Second Circuit authority in holding
that the ADEA does not provide for the recovery of monetary
damages against a labor organization, leaving plaintiffs only
with the possibility of injunctive relief in the event ALPA is
found liable under the ADEA. *Cipriano*, 700 F. Supp. at 1213.

Here, however, the only remedy plaintiffs seek from
ALPA in Count One of the Amended Complaint is monetary damages,
in addition to attorney's fees and costs for the alleged ADEA
violation. (*See* Am. Compl. ¶ 195 (stating that, because of
ALPA's violation of the ADEA, "each of the complaining
plaintiffs was deprived of such sum as may be determined at
trial to represent proceeds of distributions to which they were,
or should have been entitled, but in no event less than One
Million One Hundred Thousand ($1,100,000.00) Dollars for each
plaintiff."); *id.* at p. 44-45 ("Wherefore . . . as to the claims

set forth in Count I [the ADEA claim], as against [ALPA and Prater] such sum as may be determined at trial, but in no event less than the sum of One Million One Hundred Thousand ($1,100,000.00) Dollars for each plaintiff herein, plus the costs of maintaining this claim, including reasonable attorneys' fees).)  The Amended Complaint also contains a formulaic recitation for "such other and further relief as the Court may deem just and proper." (*Id.* at p. 48.)

Damages are an essential element of an ADEA claim, and in the absence of an available remedy, the ADEA claim must be dismissed.  *See, e.g.*, *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 909-10 (2d Cir. 1997) (affirming the dismissal of an ADEA claim on summary judgment where district court held that damages were unavailable as a matter of law); *Shaheen v. Gonzales*, 05-CV-8400, 2006 WL 3164763, at *8 (S.D.N.Y. Nov. 1, 2006) (stating "[a]s in most civil actions, an inability to prove damages is grounds for dismissal" and granting summary judgment and dismissing ADEA claim where plaintiff "cannot show that he has suffered damages for which the ADEA provides a remedy"); *Cipriano*, 700 F. Supp. at 1213 (granting summary judgment on ADEA claim against union based on the unavailability of monetary damages).  As the plaintiffs have not requested injunctive relief, there is no other remedy in connection with plaintiffs' ADEA claim against ALPA, and the claim must be

dismissed.

Plaintiffs' general requests for "such other and
further relief as to this Court may seem just and proper" and
for attorney's fees and costs do nothing to change the foregoing
analysis.  The Second Circuit has held that, in an ADEA case, an
employee's general prayer for relief was insufficient to defeat
a motion for summary judgment where the relief the plaintiff
sought was unavailable as a matter of law.  *Lightfoot*, 110 F.3d
at 910.  Moreover, an award of attorney's fees is only available
under the ADEA if a plaintiff actually prevails on his or her
claim.  *Id.* at 913-14.

In an effort to salvage their ADEA claim, plaintiffs
argue that ALPA may be viewed as an indirect or *de facto*
employer and, alternatively, that ALPA can be liable under the
ADEA claim by advancing a theory of "aiding and abetting"
liability.  (Pl. Opp. to ALPA at 11-13.)  These theories fail
for the reasons set forth below.

First, plaintiffs argue that, because ALPA was
delegated the authority to determine the allocation methods, the
court should deem the union an "employer" under the ADEA,
subject to monetary damages.  (Pl. Opp. to ALPA at 11-13.)
Specifically, plaintiffs argue the word "employer" in Title VII[50]

_____

[50] Plaintiffs argue that, because the language of the ADEA and its
prohibitions are nearly identical to the terms of Title VII, the broad

is broad enough "to encompass any party who significantly affects access of any individual to employment opportunities" and that "an entity 'closely intertwined' with the employer, but which does not employ plaintiff, may be considered an employer under Title VII 'in light of the fact that [it] delegated to [some other entity] its responsibility to provide retirement benefits.'" (*Id.* at 11 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir. 1996) and *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982), *vacated on other grounds*, 463 U.S. 1223 (1983).)

Plaintiffs' argument is unpersuasive. First, the structure of the ADEA, which specifically distinguishes between age discrimination claims brought against an "employer" and those brought against a "labor union," indicates that the ADEA holds employers and unions separately responsible for their own conduct. *Compare* 29 U.S.C. § 623(a) *with* 29 U.S.C. § 623(c). However, even if the ADEA contemplates a situation where, as here, plaintiffs seek to hold their union liable both in its capacity as plaintiffs' union and as plaintiffs' indirect or *de facto* employer, plaintiffs would be required, at the very least, to include sufficient factual allegations in the Amended Complaint to alert defendants to this theory of liability. *See,*

---

definition of "employer" under Title VII is applicable to the definition of "employer" under the ADEA. (Pl. Opp. to ALPA at 10-11.)

*e.g.*, *Kern*, 93 F.3d at 46 ("[W]hen a plaintiff brings a Title VII action against a union in its capacity as an employer, the plaintiff must demonstrate that the union meets the Title VII definition of "employer."  On the other hand, if a plaintiff brings a Title VII action against a union in its capacity as a labor organization, the plaintiff must demonstrate that the union meets that statutory definition of a "labor organization."); *see also Herman v. United Bhd. of Carpenters & Joiners*, 60 F.3d 1375, 1384-85 (9th Cir. 1995) (holding that, under the ADEA, a plaintiff who sues his employer-local-union in its capacity as an employer must demonstrate that the employer-local-union meets the statutory definition of employer). Instead, the Amended Complaint explicitly seeks to hold ALPA liable under the ADEA in its capacity as a "labor organization" under 29 U.S.C. § 623(c).  (Am. Compl. ¶¶ 61, 174 ("ALPA is a 'labor organization' within the meaning of the Age Discrimination in Employment Act and the Older Workers Benefit Protection Act and as defined in 29 U.S.C. sec. 630, in that it is a labor organization engaged in an industry affecting commerce . . .").)  Plaintiffs may not, in their Opposition papers, make arguments based on allegations which are completely absent from the Amended Complaint or assert a new cause of action in their Opposition in an effort to avoid dismissal of their ADEA claim.  Accordingly, the court finds plaintiffs'

indirect or *de facto* employer theory unsustainable and denies plaintiffs' request for discovery in order to determine whether ALPA can be properly characterized as an indirect or *de facto* employer. (Pl. Opp. to ALPA at 13.)

Finally, the plaintiffs have failed to articulate a sufficient basis for their "aider and abettor" theory of liability in this context. (*Id.* at 12-13.) Even if such liability existed under the ADEA and had been plausibly alleged, plaintiffs have cited to no cases holding that such liability would render ALPA liable for monetary damages under the ADEA.

Accordingly, for the foregoing reasons, plaintiffs' ADEA claim against ALPA is dismissed as a matter of law. *See, e.g.*, *Cipriano*, 700 F. Supp. at 1213; *Shaheen*, 2006 WL 3164763, at *8.

### 2. Breach of Contract Claim

ALPA next argues that plaintiffs' state law breach of contract claim against ALPA should be dismissed because: (1) the claim is a "minor dispute" under the RLA and therefore falls within the exclusive jurisdiction of the System Board of Adjustment ("Adjustment Board"); and alternatively, (2) the claim is preempted by the federal duty of fair representation, which is time-barred, as plaintiffs conceded at the oral argument. (*See* ALPA Mot. at 19-23; Tr. at 33-34.) The court agrees that plaintiffs' breach of contract claim against ALPA is

preempted and thus must be dismissed.

          a.     Railway Labor Act Preemption

        First, ALPA argues that plaintiffs' state-law breach of contract claim must be dismissed because the claim constitutes a "minor dispute" subject to the exclusive jurisdiction of the Adjustment Board.  In response, the plaintiffs contend that their state law contract claim exists independently of the collective bargaining agreement, and is therefore not preempted by the RLA.  (*See* Pl. Opp. to ALPA at 27-28.)  Plaintiffs alternatively argue that the question of whether their claim constitutes a "minor dispute" as a matter of law requires further discovery.  (*Id.* at 26.)  The court finds that the mandatory arbitration provision of the RLA, which governs the parties' collective bargaining agreement,[51] prevents this court from adjudicating plaintiffs' breach of contract claim.

        Labor disputes in the airline industry are governed by the RLA.  *See* 45 U.S.C. § 181; *Baylis v. Marriott Corp.*, 843 F.2d 658, 662 (2d Cir. 1988).  One of the primary purposes of the RLA is to minimize interruptions in the nation's

---

[51] As noted, *supra*, both the PWA and Letter 51 are to be administered under the RLA.  (*See* PWA at 175 (Delta Pilots' System Board of Adjustment, which is established in compliance with section 204, Title II of the Railway Labor Act, as amended, "will have jurisdiction over disputes growing out of grievances or out of the interpretation or application of any of the terms of the PWA."); Letter 51 at 1 (providing that Letter 51 "is made and entered into in accordance with the provisions of the Railway Labor Act, as amended").

transportation services by strikes and labor disputes. *Int'l Assoc. of Machinists v. Cent. Airlines, Inc*., 372 U.S. 682, 687 (1963). To effectuate that purpose, the RLA mandates the establishment of arbitration panels called "Adjustment Boards," composed of members selected by the air carriers and by labor organizations representing the employees, *Baylis*, 843 F.2d at 662, and grants exclusive jurisdiction to Adjustment Boards to resolve "minor disputes," that is, disagreements over the interpretation or application of terms in existing collective bargaining agreements. *See* 45 U.S.C. § 184; *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252-53 (1994); *Baylis*, 843 F.2d at 662 (stating that jurisdiction over a dispute concerning "the interpretation of the terms of a collective bargaining contract . . . lies exclusively with the appropriate Adjustment Board. Jurisdiction of federal courts . . . [is] limited [to] review of the decisions of the Adjustment Board.").

Unlike major disputes, which relate to "the formation of collective bargaining agreements or efforts to secure them," *Hawaiian Airlines*, 512 U.S. at 252 (internal quotation marks omitted), minor disputes "contemplate[] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." *Consol. Rail Corp. (Conrail) v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 303 (1989)

(internal citation omitted).  Accordingly, minor disputes arise out of the duties and rights created or defined by existing collective bargaining agreements.  *See Hawaiian Airlines*, 512 U.S. at 252-53 ("Minor disputes involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" (quoting *Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 33 (1957))).  Therefore, any state law claim seeking to interpret or enforce such contractual rights is preempted by the RLA.  *See Conrail*, 491 U.S. at 303-04; *Hawaiian Airlines*, 512 U.S. at 256 ("Our case law confirms that the category of minor disputes contemplated by § 151a [of the RLA] are those that are grounded in the CBA.").  On the other hand, if the claim does not require interpretation of the CBA, but rather "involves rights and obligations that exist independent of the CBA," the state law cause of action is not preempted. *Hawaiian Airlines*, 512 U.S. at 260.

Here, the allegations in the Amended Complaint make clear that plaintiffs' "breach of contract claim" against ALPA is simply a claim that the terms of the collective bargaining agreement were breached, which is a "minor" dispute subject to the exclusive jurisdiction of the Adjustment Board. Specifically, plaintiffs allege that the collective bargaining agreement between Delta and ALPA, as modified through Letter 51, gave ALPA the "exclusive authority" to determine the method of

allocation of the ALPA Claim and the Notes, which were given "in

consideration for the reductions in pay, work rules, and

benefits endured by the Delta pilots." (Am. Compl. ¶¶ 132,

137.) Plaintiffs further allege that Letter 51 created the

"only restriction" on that "exclusive authority," which was

"that such allocation had to be 'reasonable and lawful.'" (*Id.*

¶¶ 137, 138 (quoting Letter 51).) Indeed, plaintiffs allege:

> In the absence of the provision requiring that the
> method of allocation and of distribution be reasonable
> and lawful, the Union would, arguably, have been free
> to act in any manner it may have wished, including,
> for example, by allocating the [ALPA Claim and the
> Notes] in a method that prized connections to the
> Union or, as another example, would benefit one gender
> over another, one nationality over another, or even
> those with more pronounceable names over those with
> longer or more difficult names.

(*Id.* ¶ 203.) As determined, *supra*, the "reasonable and lawful"

provision only applies to the distribution of the ALPA Claim,

not the Notes. (*Compare* Letter 51 at 36 *with* Letter 51 at 40.)

Moreover, the Amended Complaint alleges that ALPA

breached the reasonable and lawful contractual terms by

allocating the proceeds in an "unreasonable" and "unlawful" way.

(Am. Compl. ¶¶ 201-08 ("In light of the fact that the method of

allocation was not reasonable and/or lawful, the particular

methodology of allocation of the Proceeds constituted a breach

of the contract between the Union and Delta").) Thus, as

plaintiffs allege, ALPA's authority to promulgate a method of

allocation of the proceeds, as well as the contractual
restrictions imposed on that methodology, were created by the
terms of the existing collective bargaining agreement between
the Delta pilots and ALPA, as modified by Letter 51.
Plaintiffs' claim for the breach of their collective bargaining
agreement therefore requires an interpretation of that agreement
and is thus preempted by the RLA. *See, e.g.*, *Cooper v. TWA
Airlines, LLC*, 349 F. Supp. 2d 495, 502, 509 (E.D.N.Y. 2004) (on
motion to dismiss, finding preempted by the RLA the plaintiffs'
state law breach of contract claims, which were premised on
breaches of collective bargaining agreements made in accordance
with the provisions of the RLA).

        In an attempt to circumvent the exclusive jurisdiction
of the RLA, in direct contradiction of the allegations in the
Amended Complaint, plaintiffs state that they are not arguing
that the collective bargaining agreement has been breached.
(Pl. Opp. to Delta at 15 ("[I]t is not claimed that the
collective bargaining agreement has been breached.  Indeed, it
was the *methodology* of allocating and distributing the claim and
notes that was at the heart of the implied contract claim, and
such methodology was not set forth in the CBA.") (emphasis in
original).)  Although plaintiffs' argument is difficult to
decipher, plaintiffs appear to be arguing that, because the
actual method of allocation was set out in documents separate

and apart from the CBA, their contractual rights do not emanate from the CBA and the RLA does not preempt their claim. (Tr. at 58-59.)

The court finds plaintiffs' arguments to be unpersuasive. Plaintiffs cannot, and have yet to, point to any source of their contractual rights external to the collective bargaining agreement.[52] *See Hawaiian Airlines*, 512 U.S. at 260 ("[A] state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA.") Without the CBA, plaintiffs would not have the right to the allocation of the proceeds and ALPA would not have the authority to distribute the ALPA Claim or the Notes subject to the restrictions set forth in Letter 51. Plaintiffs' claim, therefore, requires the court to interpret the terms and effect of the collective bargaining agreement in order to determine what duties, if any, ALPA allegedly breached by developing and implementing the disputed Claim Model and Notes Model. *See id.* at 254 ("[W]here the resolution of a state-law claim depends on

_____

[52] To the extent plaintiffs are arguing that the prohibition of discriminatory allocation of the proceeds based on age emanates from the ADEA, a source external to the CBA, the court notes that plaintiffs have brought their ADEA claim independently from their breach of contract claim, and that the court has dismissed plaintiffs' ADEA claim, without deciding whether the RLA precludes the court from hearing the ADEA claim. Furthermore, plaintiffs' claims for constructive trust and conversion were voluntarily dismissed by plaintiffs (*see generally* Stip.), and plaintiffs are unable to bring a breach of the duty of fair representation claim because it is time-barred. Plaintiffs' may not use their breach of contract claim to resurrect any of these claims.

an interpretation of the CBA, the claim is preempted.")  The
fact that descriptions of the Claim Model and the Notes Model
were set forth in documents separate from the CBA does not
change this analysis.  *See, e.g.*, *Gay v. Affourtit*, No. 89-CV-
4757, 1993 U.S. Dist. LEXIS 15163, at *5-6 (S.D.N.Y. Oct. 15,
1993) (finding the court would have to interpret the CBA in
order to adjudicate plaintiff's state law claims for slander,
prima facie tort, and conspiracy where, *inter alia*, the
provisions in the CBA referenced Federal Aviation Regulations,
which, in turn, were a part of the airline's Operations Manual
governing pilots' conduct).  Consequently, plaintiffs' state law
claim requires interpretation of the terms and effect of the
collective bargaining agreement, and is therefore preempted by
the RLA.  *See, e.g.*, *Hawaiian Airlines*, 512 U.S. at 253; *Cooper*,
349 F. Supp. 2d at 508-09 (holding the RLA preempted plaintiffs'
state law claim premised on a breach of a collective bargaining
agreement where the agreement explicitly stated it "is made and
entered into in accordance with the provisions of the [RLA],"
plaintiffs seek to protect "contractual rights negotiated under
the authority of the RLA," and protection of these contractual
rights would require interpretation of the contractual terms.)

Alternatively, plaintiffs, citing to *Urdahl v. Eastern
Airlines*, No. 86-CV-1322, 1987 U.S. Dist. LEXIS 16825 (E.D.N.Y.
Jan. 28, 1987), contend that, absent discovery, the court should

not rule as a matter of law that plaintiffs' actions involve a minor dispute subject to the exclusive jurisdiction of the System Board. (Pl. Opp. to ALPA at 26.) In *Urdahl*, the court held that further discovery may allow the plaintiff to prove that plaintiffs' state-law libel and slander claim is "merely a peripheral concern" of federal law and that plaintiff must therefore be afforded "a reasonable opportunity to conduct discovery for the purpose of showing that jurisdiction exists." *Urdahl*, 1987 U.S. Dist. LEXIS 16825, at *12-13. However, unlike in *Urdahl*, where the court confronted a state-law tort claim for libel and slander where the source of the asserted rights could potentially be found outside the CBA, the court here faces a purported breach of the collective bargaining agreement itself. Furthermore, unlike in *Urdahl*, where the court noted that "further discovery may substantiate plaintiff's argument that plaintiff's state tort action is sufficiently independent of the wrongful discharge claim that it is 'merely a peripheral concern' of federal law," *id.* at *13, the court here finds it unlikely that discovery will uncover any facts that will substantiate plaintiffs' assertions, made in contradiction to the Amended Complaint, that their claim emanates from a source outside of the collective bargaining agreement. Thus, the court declines to grant plaintiffs' request for discovery and finds that plaintiffs' state law contract claim against ALPA is a

minor dispute that is preempted by the RLA and therefore beyond the jurisdiction of the court. *See, e.g.*, *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 124-25 (D.D.C. 2008) (finding plaintiff's breach of contract claim against ALPA to be a "minor" dispute subject to mandatory arbitration).[53]

> b. Preemption by the Federal Duty of Fair Representation

ALPA next argues that, even if plaintiffs were not required to bring their breach of contract claim against ALPA to the Adjustment Board, this claim would be preempted by the federal duty of fair representation because it seeks to vindicate the same rights that are protected by the duty of fair representation. *Cooper*, 349 F. Supp. 2d at 507-08. The court agrees and finds that plaintiffs' state-law breach of contract claim is preempted by ALPA's duty of fair representation. However, plaintiffs' claim for breach of the duty of fair representation is barred by the applicable six-month statute of

---

[53] The court lacks jurisdiction over plaintiffs' claim for implied breach of contract against Delta for the same reasons set forth above. (*See* Am. Comp. ¶¶ 262-63 (alleging Delta's implied duty to assure ALPA acted in a reasonable manner is derived from Delta's "contract[] to allow the Union to allocate and distribute the Proceeds").) Further, as will be discussed below, plaintiffs have failed to timely bring a duty of fair representation claim against ALPA. Therefore, plaintiffs may not premise their claim for a breach of the collective bargaining agreement against Delta upon ALPA's breach of the duty of fair representation in order to create subject matter jurisdiction. *See Bove v. Long Island R.R.*, No. 93-CV-4032, 1995 WL 901990, at *3-8 (E.D.N.Y. Dec. 12, 1995) (dismissing claim for breach of the collective bargaining agreement against employer for lack of subject matter jurisdiction where plaintiff's duty of fair representation claim against union failed as a matter of law.)

limitations.

"A union, as the exclusive bargaining representative of the employees it represents, owes the employees a duty to represent them fairly in collective bargaining with the employer and in enforcing the resulting CBA." *Cooper*, 349 F. Supp. 2d at 507 (citing *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 201-02 (1944); *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). This duty requires the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177. Accordingly, a plaintiff may sue the union for a breach of its duty of fair representation when a union's conduct towards its member is "arbitrary, discriminatory, or in bad faith." *Id*. at 190.

Because federal law defines the scope of the duty of fair representation owed by a union to its members, state law claims that are "mere refinements" of the duty of fair representation are preempted by the RLA. *See Cooper*, 349 F. Supp. 2d at 507-08. A state law claim is a "mere refinement" of the duty of fair representation if it is based on the same conduct that would support a federal duty of fair representation claim or if it seeks to vindicate the same rights as the federal duty of fair representation. *Id*. at 508; *Garland v. U.S.*

*Airways, Inc.*, No. 05-CV-140, 2006 WL 3692591, at *7 (W.D. Pa. Dec. 12, 2006), *aff'd*, 270 Fed. Appx. 99 (3d Cir. 2008) ("Plaintiff cannot avoid dismissal of his [duty of fair representation] claim simply by repackaging that claim under the guise of a different cause of action.").

In this case, plaintiffs' state law claim for breach of contract against ALPA is, in substance, a claim of breach of ALPA's duty of fair representation under the RLA. Although plaintiffs' claim is couched in terms of state breach of contract law, the claim is based on the same facts and theories of obligations that would support a federal duty of fair representation, namely, that ALPA's conduct in allocating and distributing bankruptcy proceeds bargained-for on behalf its members was invidious, unreasonable, and arbitrary. Indeed, the allegations in support of the breach of contract claim in the Amended Complaint allege that ALPA's conduct in the methodology of allocation and distribution of the Claims and Notes was "unlawful in that it . . . constitutes a violation of the Union's duty of fair representation in that it is discriminatory, arbitrary, and/or constitutes bad faith." (Am. Compl. ¶ 207.) Plaintiffs' breach of contract claim is therefore preempted by federal law. *See, e.g.*, *Cooper*, 349 F. Supp. 2d at 508 ("If the duty of fair representation is [unavailable], plaintiffs cannot avoid that result by simply

using state common law labels for their claims.  Put another way, plaintiffs cannot substitute for an inadequate duty of fair representation claim a state law claim arising out of the same facts and theories of obligation or 'mere refinements' of those theories."); *Garland*, 2006 WL 3692591, at *5-7 (finding the proper avenue of relief for plaintiff's breach of contract claim against ALPA was a duty of fair representation claim, but that plaintiff had failed to timely bring that claim).

Notably, in every other case that the court has found where pilot plaintiffs alleged that ALPA failed to reasonably allocate proceeds received as a part of the pilot employer's bankruptcy pursuant to modified collective bargaining agreements, the plaintiffs appropriately sued (or attempted to sue) ALPA under the theory of breach of the duty of fair representation.  *See, e.g.*, *Bondurant v. Air Line Pilots Ass'n*, --- F. Supp. 2d ----, No. 07-CV-15383, 2010 WL 2352052, at *1 (E.D. Mich. June 8, 2010) (alleging ALPA breached its duty of fair representation and violated the ADEA by failing to fairly administer to pilots required to retire under the Age 60 Rule a full share of their pre-petition bankruptcy claim); *Gilliland v. Air Line Pilots Ass'n, Int'l*, --- F. Supp. 2d ----, No. 07-CV-3082, 2009 WL 6898343, at *5 (N.D. Ga. filed Oct. 15, 2009), *aff'd*, 2010 WL 3636746 (11th Cir. Sept. 21, 2010) (alleging, *inter alia*, that ALPA breached its duty of fair representation

and violated the Americans with Disability Act of 1990, 42 U.S.C. § 12101, *et seq.*, by developing a claim allocation model that unlawfully discriminated against plaintiff based on his disability); *Mansfield*, 2007 WL 2048664, at *1 (alleging ALPA breached its duty of fair representation by the manner in which it distributed the proceeds of convertible notes it received as a part of United's bankruptcy). *See also Vaughn*, 395 B.R. at 528, 535-540 (alleging ALPA breached its duty of fair representation and violated the ADEA in the manner in which it negotiated the termination of the pilots' defined benefit plan and the terms of the replacement pension plans).

The instant plaintiffs did not assert a breach of the duty of fair representation claim in the Amended Complaint, because, as plaintiffs conceded at oral argument, that claim is time-barred. (Tr. at 33-34); *see also Eatz v. DME Unit of Local Union Number 3 of the Int'l Broth. of Elec. Workers, AFL-CIO*, 794 F.2d 29, 33 (2d Cir. 1986) (A claim for breach of the duty of fair representation must be commenced within six month from when plaintiff knew or reasonably should have known a breach occurred.). Thus, plaintiffs cannot assert an expired claim for breach of the duty of fair representation. Accordingly, without a duty of fair representation claim, the court may not exercise

jurisdiction over plaintiffs' preempted state law claims.[54]
Plaintiffs' attempt to bring a duty of fair representation claim
through its state law breach of contract claim as an end-run-
around of the six-month statute of limitations period will not
be permitted.

C. Leave to Amend[55]

    The decision of whether to allow plaintiffs leave to
amend their Amended Complaint is left to the sound discretion of

---

[54] Based on the allegations in the Amended Complaint, plaintiffs also appear
to be asserting that they are entitled to recovery based on their status as
"intended third-party beneficiaries" to the collective bargaining agreement
between ALPA and Delta.  (Am. Compl. ¶ 209.)  However, plaintiffs have failed
to cite to authority holding that, under the RLA, they, as individual
employees who are not parties to the PWA or to Letter 51, can recover under a
third-party beneficiary theory.  To the extent this theory is available in
cases arising under the RLA, as it is in cases arising under section 301 of
the LMRA, case law is clear that plaintiffs "must be able to point to
language in the collective-bargaining agreement specifically indicating an
intent to create obligations enforceable against the union by the individual
employees." *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 374 (1990).
Plaintiffs fail to do so.  Here, instead of alleging or "point[ing] to [any]
independent duty owed them individually under the [CBA]," *Lindsay v. Ass'n of
Prof'l Flight Attendants*, 581 F.3d 47, 59 n.6 (2d Cir. 2009), plaintiffs
merely allege in a conclusory fashion that they were harmed in their capacity
as "intended third-party beneficiaries of the contract between [ALPA] and
[Delta]."  (*See* Am. Compl. ¶ 209.)  Without such an allegation, plaintiffs'
breach of contract claim against ALPA plainly fails to state a claim.  *See
Frimpong v. 1199 SEIU United Healthcare Workers E.*, No. 07-CV-7375, 2008 WL
3861449, *3-4 (S.D.N.Y. Aug. 18, 2008) (finding plaintiff's breach of
contract claim against the union to be legally insufficient where the
plaintiff's complaint failed to point to language in CBA which "create[d] an
obligation enforceable against the Union by individual employees," and
finding instead that "any duty the Union might have to assist its employees
[was] inextricably intertwined and embodied in the union's duty of fair
representation") (internal quotation marks and citation omitted); *Bryant v.
Int'l Union*, United Mine Workers of America, 467 F.2d 1, 5 (6th Cir. 1972),
*cert. denied*, 410 U.S. 930 (1973) ("It would be a mistake of vast proportion
to read every power granted the union by management as creating a corollary
contract right in the employee as against the union.").

[55] Although plaintiffs have not moved for leave to amend their First Amended
Complaint, the court, in the interest of fairness, considers whether to
afford plaintiffs a chance to replead.

this court; however, there must be a good reason for denying
plaintiffs the opportunity to replead. *Acito v. IMCERA Group,
Inc.*, 47 F.3d 47, 55 (2d Cir. 1995). One good reason to deny
plaintiffs leave to amend "is when such leave would be futile."
*Id.* Indeed, if a plaintiff is unable to allege any fact
sufficient to support its claim, a complaint should be dismissed
with prejudice. *See, e.g.*, *Spain v. Ball*, 928 F.2d 61, 62-63
(2d Cir. 1991).

First, because the court has dismissed the ADEA and
implied breach of contract claims against Delta based on the
Discharge and Release Clause (for conduct relating to the Claim
Model) and on the Exculpation Clause (for conduct relating to
the Notes Model) contained in the Confirmation Order and Plan,
the only additional facts plaintiffs could potentially plead to
move the case forward against Delta relate to Delta's alleged
willful misconduct with regard to the Notes. However, given the
deficiencies in the Amended Complaint as well as plaintiffs'
inability, at oral argument, to articulate or identify any facts
giving rise to a plausible inference of willful misconduct on
the part of Delta, the court determines that leave to replead
would be futile. Furthermore, given the unavailability of a
remedy for the ADEA claim against ALPA and the preemption of the
breach of contract claim against ALPA, the court finds the
plaintiffs' case against ALPA to be fatally deficient and

declines to offer plaintiffs leave to amend.

Plaintiffs, who have not requested leave to amend orally or in writing, provide the court with no reason to believe that they can, if given the opportunity, replead in good faith the factual allegations necessary to move their case forward. Accordingly, because providing plaintiffs leave to amend would be futile, the court dismisses plaintiffs' Amended Complaint with prejudice. *See Vaughn*, 395 B.R. at 552 (denying plaintiffs' request for leave to amend their complaint because any further amendments would be futile).

## CONCLUSION

For the foregoing reasons, Delta's and ALPA's motions to dismiss are granted in their entirety. Plaintiffs' Amended Complaint is dismissed with prejudice. The Clerk of Court is respectfully requested to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated:      October 12, 2010
            Brooklyn, New York

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge